## JESUP *v.* ILLINOIS CENT. R. Co. *et al.*

## DUBUQUE & S. C. R. Co. *v.* JESUP *et al.*

(*Circuit Court, N. D. Illinois.* October 6, 1890.)

1. **EQUITY—JURISDICTION—RAILROAD LEASE—ENFORCEMENT.**
   In September, 1866, the Cedar Falls Railroad Company leased its road to the Dubuque Company for the term of 40 years. A year later the Dubuque Company leased its own road to the Illinois Central Railroad Company for 20 years, with the option to retain it in perpetuity, and the latter company agreed to assume the lease theretofore entered into between the Dubuque and the Cedar Falls Railroads. *Held,* that the assumption of this lease by the Illinois Central created no direct obligation on its part to the Cedar Falls Company which it or its mortgagees could enforce by an action at law, but such obligation could be enforced only by a suit in equity.

2. **RAILROAD COMPANIES—ASSUMPTION OF LEASE—CONSTRUCTION.**
   As the Illinois Central elected to surrender both the Dubuque and Cedar Falls roads to the Dubuque Company, after the expiration of 20 years, the assumption of the lease of the Cedar Falls road by the Illinois Central does not bind it for the rent of the Cedar Falls road after the expiration of the 20 years for which it had leased the Dubuque road, which forms the connecting link between the Illinois Central and the Cedar Falls Railroads.

3. **SAME—ESTOPPEL.**
   An indorsement on the bonds of the Cedar Falls Company, made by its president, to the effect that the Illinois Central had assumed the lease, and that the minimum rent which that company had thereby obligated itself to pay is more than sufficient to meet the entire amount of interest on the bonds, does not estop the Illinois Central from denying its liability on the lease after the expiration of the 20 years, where such indorsement was not made at its instance or by its direction.

4. **EQUITY—JURISDICTION—CROSS-BILL—DISMISSAL OF ORIGINAL BILL.**
   The trustee in a mortgage executed by the Cedar Falls Company to secure the proper application of the rents of its road filed his bill against the Illinois Central, the Dubuque, and the Cedar Falls Companies, alleging the insolvency of the latter company and its refusal to collect the rents. The prayer of the bill was that the trustee be henceforth empowered to collect such rents, and that the lease be declared binding on the Illinois Central for the entire term of 40 years. *Held* that, after a dismissal of the bill as to the Illinois Central, the court still had jurisdiction of a cross bill filed by the Dubuque Company against the Cedar Falls Company and the trustee asking for a cancellation of the lease of the Cedar Falls road, as the relief sought by the cross-bill is directly connected with the subject-matter of the original bill, and is of an affirmative character.

5. **SAME—RESIDENCE.**
   The fact that the Dubuque Company and the Cedar Falls Company are both Iowa corporations will not defeat the jurisdiction of this court over the cross-bill; both of these corporations being properly before the court as parties to the original bill.

6. **RAILROAD COMPANIES—LEASE—FRAUD OF DIRECTORS.**
   The fact that the directors of the Dubuque Company failed to make the continuance of the lease of the Cedar Falls road dependent on construction of roads in Minnesota that would connect that road with St. Paul or Minneapolis, which was the expectation when the lease was executed, but which expectation was never realized, will not warrant the presumption that the directors of the Dubuque Company were guilty of actual fraud towards that company in executing the lease.

7. **SAME—EXCESSIVE RENT.**
   Neither will the court indulge the presumption of fraud against the directors of the Dubuque Company because the rent stipulated for in the lease turned out to be larger than the business over the Cedar Falls road really justified, where such rent was fixed in accordance with the report of competent and disinterested experts, to whom that question had been referred.

8. **SAME—EVIDENCE OF FRAUD.**
   The fact that the bonds and stocks allowed by the Cedar Falls Company to those constructing its road, some of whom were also directors of the Dubuque Company, were in excess of the actual cost of construction, is a matter entirely between the Cedar Falls Company and those who received such bonds, and in no wise affects the Dubuque Company or the validity of its lease of the Cedar Falls road.

9. CORPORATIONS—CONTRACTS—DIRECTORS.

A contract, in the name of a corporation, by its board of directors, is not void, if otherwise unassailable, simply because some of the directors, constituting a minority, used their position with the effect, or even for the purpose, of advancing their personal interest to the injury of the company they assumed to represent, although the fact that such directors, constituting but a minority, participated in the making of the contract, would cause the transaction to be closely scrutinized, to the end that the rights of complaining stockholders, however small in number, might not be sacrificed by those who were bound to protect their interests.

10. SAME—VOIDABLE CONTRACT.

The contract by which the Dubuque Company leased the Cedar Falls road would not have been void even if the majority of the directors of that company had been personally interested in the Cedar Falls Company. It would have been simply voidable at the election of the Dubuque Company, or, in a proper case, at the suit of its stockholders, and that election must have been exercised, or the suit brought, within such time as was reasonable, taking into consideration all the facts and circumstances of the case, including the nature of the property that was the subject of the lease.

11. SAME—ACTION TO SET ASIDE—TIME TO SUE.

The rule is a wholesome one that requires the court, in cases of merely voidable contracts, to withhold relief from those who, with knowledge of the facts, or with full opportunity to ascertain them, unreasonably postpone application for relief.

12. SAME—RATIFICATION BY ACQUIESCENCE.

A contract not wholly invalid when executed. nor prohibited by law as relating to some illegal transaction, and which is therefore voidable only, may become, by the acts of the parties or by long acquiescence, binding upon them, especially where the nature of the property, which is the subject of the contract, is such that its value may be affected by its relations to other property of like kind or by the changing business of the country.

13. SAME—DELAY IN SUING.

While the law will always condemn the transactions of a party in his own behalf, when in respect to the matter concerned he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted, resistance of that character cannot be predicated of a case of a merely voidable contract, where the party complaining has not simply been silent for 20 years, but with knowledge of the facts, or with full opportunity to ascertain them, has enjoyed the fruits of the contract, and treated it as valid.

14. SAME—KNOWLEDGE OF STOCKHOLDERS.

The stockholders of the Dubuque Company, who would have ascertained the facts relating to the lease by the exercise of the slightest diligence at any time during the 20 years, are chargeable with knowledge of the fact of the lease, as well as of its terms, and cannot question its validity after it has been acted on during all that time by the Cedar Falls Company and its creditors.

In Equity.

Morris K. Jesup, plaintiff in the original suit, and a citizen of New York, is the surviving trustee in a mortgage made September 22, 1866, by the Cedar Falls & Minnesota Railroad Company, covering its road and the net earnings thereof, its franchises, privileges, right of way, depot grounds, and all material designed to be used in construction; also "the rents and moneys payable by any person or company" to that corporation "for the use of said road and appurtenances."

The main question in the original suit is whether the Illinois Central Railroad Company is liable to account to said trustee for certain rents reserved to the Cedar Falls & Minnesota Railroad Company in a lease by the latter company of its road, franchises, privileges, etc., to the Dubuque & Sioux City Railroad Company, a corporation of Iowa, which lease was assumed by the Illinois Central Railroad Company in a written contract, whereby the Dubuque & Sioux City Railroad Company, to be hereafter called the "Dubuque Company,".leased its own road to the Illinois Central Railroad Company, for a specified term, with an option to retain it in perpetuity.

The question in the cross-suit is whether the Dubuque Company is entitled to a decree for the surrender and cancellation of the lease to it of the Cedar Falls & Minnesota Railroad.

The original and cross suits, as to some matters, are so closely connected that it will be proper to state the principal facts in chronological order, without stopping to distinguish those specially applicable to the original suit from those that are material in the cross-suit.

The case made by the pleadings, exhibits, and proofs is, in substance, as follows:

The Cedar Falls & Minnesota Railroad Company, to be hereafter called the "Cedar Falls Company," was incorporated in the year 1858, under the laws of Iowa, for the purpose of constructing a railway from a point in that state on the Dubuque & Sioux City Railroad to the Minnesota state line. Its proposed route was through Waverly and Charles City to Mona, on the line between Iowa and Minnesota.

The completion of the road to Mona became an object of great interest to the Dubuque Company. As early as December 29, 1860, the board of directors of that company, obviously for the purpose of assisting the Cedar Falls Company, passed a resolution reciting that it was "important to the interests of the Dubuque and Sioux City Railroad that the construction of the Cedar Falls and Minnesota Railroad, lying between the Dubuque and Sioux City Railroad and the state line of Minnesota, should be prosecuted with all possible dispatch," and directing "that for the term of five years from the 1st of January, 1862, there shall be paid by the Dubuque and Sioux City Railroad Company, in monthly payments, to the order of the trustees of the first mortgage bonds of the Cedar Falls and Minneapolis Railroad Company, fifteen per cent. of the gross earnings from all business passing to and from all points upon the Cedar Falls and Minnesota Railroad, provided the same is upon the through tickets or bills of lading, and upon condition that such fifteen per cent. so paid shall be applied to the purchase and cancellation of the bonds issued by said company." In 1863 it made, with the Cedar Falls Company, what is called a "drawback contract," to continue in force for 10 years from March 15, 1863, whereby, "for the purpose of inducing the investment of capital in the construction of the Cedar Falls and Minnesota Railroad," it agreed with "John Jackson, M. K. Jesup, and James Huff, trustees of said Cedar Falls and Minnesota Railroad," to pay over to them "fifteen per cent. of the gross earnings earned upon their road, or [upon] any part thereof, in the transportation of passengers or freight coming from or going to any place or station on said Cedar Falls and Minnesota road." That contract provided that this 15 per cent. should be applied to the payment of interest on any construction bonds issued for the purpose of constructing or equipping the Cedar Falls road.

In the annual report of the president of the Dubuque Company, January 1, 1864, it was said that "when another division shall be completed, and the road built from Cedar Falls to the Minnesota state line, a portion of which is now under contract, there would seem to be no reason why

the common stock even should not become valuable." In the report of the operations of the Dubuque Company for the five months ending March 16, 1864, it was said:

"The Cedar Falls and Minnesota Railroad is under contract from Cedar Falls to Waverly, a distance of 14 miles. It is expected that it will be completed and in operation early next fall. On the 9th of March, 1863, the Dubuque and Sioux City Railroad Company entered into a contract allowing a drawback to that road of 15 per cent. of all business coming from or going to that road. The Galena and Chicago Union and Illinois Central Companies will both enter into like contracts. This road when completed to the state line will, in connection with the Minnesota Central Railroad, form a continuous line to Minneapolis and St. Paul. The Minnesota Central Railroad Company expect to build their road to within thirty miles of the state line this year. These two roads when completed will form a very important railroad connection, and a valuable contributor to the Dubuque and Sioux City. The country on the line is tolerably well settled now, and is one of the finest wheat-growing regions west of the Mississippi. The Cedar valley for beauty, fertility of soil, and water-power cannot be surpassed by any other valley in the north-west."

These views were shared by many, if not by all, who were largely interested in the prosperity of the Dubuque Company. The result was that in October, 1864, the directors of that company passed a resolution authorizing its president to lease the Cedar Falls Railroad from station to station, as the track was completed and in running order, and Allan Campbell, one of the board, was appointed to examine the road, and report upon the amount of rent to be paid. In his report he stated that, while he thought well "of the business of this northern line," it was impossible, upon a cursory examination, and before the road was completed, to establish a rent that would be fair and equitable between the parties. He added:

"From my own observation, and from information derived from various sources, I feel a strong assurance that this northern road, when completed to the Minnesota state line, a distance of —— miles, will tend materially to increase the receipts of the Dubuque and Sioux City road. The route passes through a rich grain country, and along water-courses which furnish a cheap and never-failing power for manufacturing purposes."

The terms of the proposed lease were for some time the subject of considerable discussion, particularly as to the amount of rent to be paid to the Cedar Falls Company. The matter was referred by that company to Col. R. B. Mason, a stockholder and former director of the Dubuque Company, and T. B. Blackstone, president of the Chicago & Alton Railroad Company, both gentlemen of high standing and of large experience in railroad matters. Neither of them had the slightest interest in the Cedar Falls Company. To them was submitted the form of a lease prepared by the vice-president of the Cedar Falls Company. They reported:

"The Dubuque and Sioux City Railroad Company under such a lease would receive, when the earnings amounted to $3,500 per mile, about 54 per cent., and, when the earnings amounted to $10,000 per mile, about 58 per cent., of the gross earnings. We do not think this would leave a very large margin for the Dubuque and Sioux City Railroad Company. But if a good road is constructed, complete in all respects, we believe, from the best information we have, that if $1,500 per mile and forty per cent. of the excess over $3,500

per mile was paid to the Cedar Falls and Minnesota Railroad, it would be a fair and equitable arrangement between the parties."

The letter or report having been submitted to the directors of the Dubuque Company, the latter authorized a lease upon the terms suggested by Mason and Blackstone, "except that the division of earnings after $3,500 per mile shall be seventy per cent. for the Dubuque and Sioux City Railroad Company and thirty per cent. for the Cedar Falls and Minnesota Railroad Company, and that said lease commence January 1, 1866;" further, that the lease should be in lieu of the drawback contract then existing between the companies.

By this lease, which was dated September 27, 1866, the Dubuque Company agreed to pay to the Cedar Falls Company, during the term of 40 years from January 1, 1867, a fixed rental of $1,500 per mile per annum, in equal monthly installments, and a further rent, every six months, of 35 per cent. of the gross earnings of the leased property when they exceeded $3,500 per mile per annum, and did not exceed $7,000 per mile per annum, and 30 per cent. of the gross earnings when they exceeded the latter sum per mile per annum. The lessee company covenanted to take possession of the road as it was opened from station to station, and to fully and efficiently equip, operate, and maintain it, assuming all liabilities and paying all expenses incident thereto, and giving to the leased property the same care and attention bestowed upon its own road.

This lease, by its terms, superseded the then existing drawback contract between the parties.

The mortgage in question, although antedating this lease, must have been executed subsequently, for it recites that the Cedar Falls Company "have leased their road, constructed and to be constructed, to the Dubuque and Sioux City Railroad Company," and states the terms of the lease as they appear in the instrument of September 27, 1866; or it may have been executed on the day it bears date, in anticipation of a lease then agreed to be made. It was given to secure the proper application of the rents and profits of the Cedar Falls road, constructed and to be constructed, and the punctual payment of the principal and interest of construction bonds proposed to be issued, and which were issued, for $1,407,000, maturing January 1, 1907, and bearing interest at the rate of 7 per cent. per annum, payable semi-annually. It constitutes a second lien on the part of the road then constructed from the junction with the Dubuque road, near Cedar Falls, to Waverly, a distance of about 14 miles, and a first lien upon the road to be constructed from Waverly to the Minnesota state line. The first lien on the 14 miles of road then constructed was created by a recorded deed of trust to Jesup and Richmond, dated April 25, 1864, to secure certain bonds issued by the Cedar Falls Company, of which $210,000 were outstanding when the mortgage for $1,407,000 was made. The mortgage of September 22, 1866, recites the purpose of the Cedar Falls Company to issue certificates of stock on its railroad, constructed and to be constructed, at the rate of $21,000 per mile, including the stock already issued. It also provides, among

other things, that the Cedar Falls Company should remain in possession of its road, or in receipt of the rents and profits, so long as it was not in default as to any of the bonds mentioned, or in applying the income, rents, and profits, as indicated in the mortgage; but that "in case of default of payment of either of said bonds or of the interest coupons, or of failure to apply the income, rents, and profits as above provided, it shall be the duty of said trustees to proceed to enforce payment by foreclosure, or to collect and disburse the income, rents, and profits in the manner above provided, as to them shall seem best for the interest of all parties concerned."

The Dubuque Company took possession of the Cedar Falls road under the above lease. But on the 13th day of September, 1867, it leased its own road and appurtenances to the Illinois Central Railroad Company for the term of 20 years from October 1, 1867, at an annual rental of 35 per cent. of its gross earnings during the first 10 years of the lease, and 36 per cent. during the last 10 years, with the option, "during said term of twenty years, to take the Dubuque and Sioux City Railroad and before-mentioned property in perpetuity, paying 36 per cent. of the gross earnings thereof, and in that case no charge for improvements of any kind is to be made." It was also provided that, if the Illinois Central Railroad Company failed to give notice of its election to surrender the property at the end of 20 years, it would be deemed to have exercised the option to keep it in perpetuity at an annual rental of 36 per cent. of its gross earnings.

This lease, to which was appended a copy of the Cedar Falls lease, contained a clause upon which Jesup, the trustee, bases, in part, his claim against the Illinois Central Railroad Company. That clause is in these words:

"It is further agreed that the party of the second part [the Illinois Central Railroad Company] shall assume the lease made by the party of the first part [the Dubuque Company] with the Cedar Falls and Minnesota Railroad Company."

The Illinois Central Railroad Company took possession of the Dubuque and Cedar Falls roads under the lease of September 13, 1867, and operated both roads, paying to the Dubuque Company, for a time, the rental stipulated in the lease of September 27, 1866, but subsequently making payment directly to the Cedar Falls Company. It elected, upon due notice, to surrender the Dubuque road after the expiration of 20 years from October 1, 1867, and on the 1st of October, 1887, it did surrender to the Dubuque Company the possession of both the Dubuque and Cedar Falls roads. The Dubuque Company and the Illinois Central Railroad Company had a settlement, in which the former admitted its indebtedness to the latter in the sum of $529,634, which was paid by a note maturing October 1, 1888. The parties agreed, in that settlement, that neither had any claim or demand against the other growing out of the lease of September 13, 1867.

It is admitted that the rental accruing to the Cedar Falls Company during the 20 years its road was held by the Illinois Central Railroad

Company, that is, up to October 1, 1887, was fully paid by the latter company before this litigation was commenced.

The original suit was instituted by Jesup and Forrest, trustees, on the 1st day of March, 1888, against the three railroad companies named in the caption.    The bill, after setting out the terms of the mortgage of September 22, 1866, and the lease of September 27, 1866, alleged that the latter was the result of negotiations between the defendant railway companies, having in view the extension of the Cedar Falls road to the Minnesota line, so as to open that state to the Illinois Central Railroad and its connections; that said bonds, aggregating $1,407,000, and the mortgage to secure the same, were made in order that the lease of the Cedar Falls road might be executed according to the understanding resulting from the alleged negotiations; that the Illinois Central Railroad Company entered into possession of that part of the Cedar Falls road then constructed, and was accepted as lessee in fact in place of the Dubuque Company; that thereupon, and not before, the construction bonds were placed upon the market and negotiated upon the faith of both leases, having on them, pursuant to an agreement with the Illinois Central Railroad Company, an indorsement dated New York, October 1, 1867, and signed by John S. Kennedy, as president of the Cedar Falls Company, in these words:

"The lease of the Cedar Falls and Minnesota Railroad to the Dubuque and Sioux City Railroad Company, referred to in the within bond, has this day been assumed by the Illinois Central Railroad Company, and the minimum rent which that company has thereby obligated to pay in monthly installments is more than sufficient to meet the entire amount of interest on this issue of bonds;"

—that the work of constructing the remaining portion of the Cedar Falls road was carried on with the money derived from the sale of such bonds, and was accepted by the Illinois Central Railroad Company, which continued to operate the road, receiving the rents and income therefrom, and paying the fixed rental thereof to the Cedar Falls Company; and that about or during the year 1866 the Illinois Central Railroad Company purchased and acquired control of the stock, and thereby of the management, of the Dubuque Company, for the purpose, among other things, of wrecking and destroying the Cedar Falls Company, and thereupon subverted the Dubuque road to its own use and purposes, causing the Dubuque Company to take steps looking to a surrender by it of the lease of the Cedar Falls road.

The bill further alleged that the Illinois Central Railroad Company has neglected to perform the covenants in the lease of 1867, and to account for the earnings and income of the Cedar Falls road, in consequence of which the Cedar Falls Company has made default in the payment of the bonds and coupons mentioned in said deed of trust, to-wit, the semi-annual coupons due January 1, 1888; that the latter company was insolvent, and without resources, other than said leased property; that it had not only failed to collect and properly apply the income, rents, and profits of the mortgaged property, but had misapplied some portions of

them; and that a foreclosure and sale of the mortgaged property, before the obligation of the Illinois Central Railroad Company to assume the lease of September 27, 1866, shall have been enforced, would be injurious to the Cedar Falls Company and its stockholders, as well as to the holders of the bonds secured by the mortgage.

The trustees pray that it may be adjudged and decreed:

That they alone are henceforth entitled to receive and collect the rents, income, and profits arising from the mortgaged premises; that they be subrogated to the rights and interests of the Cedar Falls Company under the lease to the Dubuque Company for and during the remainder of the term of 40 years, with all the rights of the lessor against the other defendants for an accounting of past transactions under the lease; that the lease of September 27, 1866, is a lawful, valid, and subsisting instrument, assumed by and binding upon the Illinois Central Railroad Company, according to the terms and tenor thereof, throughout the entire term of 40 years originally demised; that the latter company account for the rents reserved under the lease; that the plaintiffs have judgment against it for all rents, income, and profits now due and owing to the Cedar Falls Company under and by virtue of such lease; that the Illinois Central Railroad Company is estopped from alleging or giving out that the indorsement on said bonds was not their act and deed, and is bound to continue to occupy the premises demised by the Cedar Falls Company, operating, repairing, and maintaining the same, as provided for in the lease; that the defendants be restrained from entering into any arrangement, or from agreeing, that said lease is void or voidable, or from paying rents to any other persons than the plaintiff; that they severally account to the plaintiff for all sums of money received by them, or either of them, for the demised premises; that the Illinois Central Railroad Company, under the direction of the court, put the demised premises in good condition and repair, as required by the lease, and that an accounting be had to ascertain the amount necessary for that purpose; that, upon its refusal and neglect to pay such amount, judgment be entered therefor in favor of the plaintiff; and that the plaintiff have complete, full, and adequate relief as may seem meet.

The Cedar Falls Company entered its appearance, but has never filed an answer to the original bill.

The Illinois Central Railroad Company answered, denying that it was directly or indirectly concerned in the negotiations resulting in the lease of the Cedar Falls road to the Dubuque Company, or that it ever assumed any obligations in respect to that road, except those contained in its lease of the Dubuque road, and that it had fully met and performed all of those obligations.    It denied that it assumed the lease of the Cedar Falls road for the full term of 40 years, and insisted that it only agreed to carry out the provisions thereof during the term for which it leased, and should retain, the Dubuque road and appurtenances.    It denies that it is indebted to plaintiff or to the Cedar Falls Company in any sum whatever, because it had, prior to the institution of this action, paid over to the Cedar Falls Company the entire rent reserved by the lease of

September 27, 1866, for the full term during which it held its road, and, on the 1st day of October, 1887, surrendered to the Dubuque Company both the Dubuque and Cedar Falls roads. The answer of this company is quite lengthy, but the above is a sufficient statement of the grounds upon which it resists any decree against itself.

It will be remembered that some time after its answer was filed the Illinois Central Company moved that the suit be dismissed upon the ground that the Dubuque Company was an indispensable party to the relief sought in the original suit, and, not having voluntarily appeared herein, and being an Iowa corporation, it could not be brought before the court by service of process, so as to be bound by any decree that might be rendered. Upon the hearing of this motion it was ordered, December 4, 1888, that the bill and all proceedings under it stand dismissed, unless the Dubuque Company, on or before the first Monday in February, 1889, by voluntary appearance herein or otherwise, became subject to the authority of the court in this case.

The Dubuque Company subsequently entered its appearance and filed an answer. It also, by leave of the court, filed a cross-bill against the trustees in the mortgage of 1867 and against the Cedar Falls Company, which states with much detail the facts and circumstances upon which rests its claim to have the lease of September 27, 1866, set aside and canceled. The cross-bill proceeds, mainly, on these grounds: That Morris K. Jesup, Platt Smith, Charles L. Frost, D. Willis James, and Isaac H. Knox, continuously, and others from time to time, were directors, officers, and agents of the Dubuque Company; that they and their associates constituted a syndicate organized for the purpose of constructing the Cedar Falls road, not for the purpose of operating it themselves, but as a piece of marketable property; that they did this under the corporate name of the Cedar Falls Company, which, as an organization, they owned and controlled; that in negotiating and making the lease of the Cedar Falls road, which lease was and is burdensome and injurious to the Dubuque Company, the managing officers and directors of the latter company were, as such directors and officers, dealing with themselves, in reference to matters in which they were privately and personally interested; that such dealings between parties thus situated were prohibited by law and by public policy; that in said transactions, Jesup and his "associates," holding fiduciary relations with the Dubuque Company, knowingly and fraudulently disregarded and sacrificed its interests for the purposes of profit and advantage to themselves individually as stockholders and bondholders of the Cedar Falls Company; and, consequently, that the Dubuque Company is entitled to a decree canceling the lease in question.

It is also alleged in the cross-bill that during the term of 20 years, while the Cedar Falls road was controlled by the Illinois Central Railroad Company, it was a matter of no moment to the stockholders of the Dubuque Company what was the amount of rent reserved to the Cedar Falls Company by the lease of September 27, 1866, because the Illinois Central Railroad Company, in its contract with the Dubuque Company,

had assumed such lease; that Jesup remained in the position of president and director of the Dubuque Company from the date of the execution of the lease of 1866 until September, 1887, during which time he assumed and exercised, and was accorded by the other acting directors, the absolute and exclusive control of that company; that he dictated its policy and management, and concealed from it all knowledge of the facts; that on the day last named he and the other directors of the Dubuque Company resigned, whereby its stockholders, through a new board of directors, became at the end of 20 years for the first time possessed of the ability to ascertain the true position of that company, and to manage its affairs for its best welfare; that, until the present time, it has not had the power to institute in its own name any action for the purpose of submitting the question of the validity of said lease to judicial decision; and that, while such lease is in existence under the hands of its officers and its corporate seal, it affords a continuous right of action at law to the Cedar Falls Company and the trustees in its mortgage for the recovery, monthly, of the stipulated rental.

Other grounds set out in the cross-bill for the cancellation of the lease are that there was no authority under the laws of Iowa for the execution either of the lease or of the mortgage; that the lease of the Cedar Falls road was never lawfully authorized and adopted by the then directors of the Dubuque Company, three-fourths in value of the preferred stockholders not having given their written consent to it, or to the indebtedness created thereby; and that it was never lawfully or intelligently ratified or confirmed by the stockholders of that company.

Jesup, trustee, (his co-trustee, Forrest, also a citizen of New York, having died after this litigation commenced,) and the Cedar Falls Company filed separate answers to the cross-bill, each denying all the allegations therein contained that impeached the integrity or fairness of the mortgage of September 22, 1866, or the lease of September 27, 1866, and contesting the right of the Dubuque Company to have the lease . ; aside and canceled. .

After the issues upon the cross-bill were made up, this cause was before the court upon various motions, among others, a motion of the Dubuque Company for an injunction restraining the surviving trustee, Jesup, and the Cedar Falls Company from commencing or prosecuting any separate action against it for the recovery of rents accruing under the lease of September 27, 1866. By an order entered May 13, 1889, this motion was granted, upon condition that the Dubuque Company deposited in the registry of this court, subject to its final order, the full amount of fixed rentals accruing under said lease and unpaid, namely, those accruing since October 1, 1887, at the rate of $1,500 per mile per annum, and that it deposit further fixed rentals, as they became due and payable; such deposits, however, being without prejudice to the rights of the parties, or either of them, in respect to the ultimate disposition of the sums so paid into court. This order was complied with by a deposit in the registry of the court of the sum of $187,553.28, the amount of said fixed rentals, at the above rate, from October 1, 1887, to May 1, 1889.

The injunction asked for was accordingly granted. The fixed rentals accruing since the last date have been regularly paid into court.

*Thomas De Witt Cuyler*, *Francis B. Daniels*, and *John E. Parsons*, for Morris K. Jesup, trustee.

*Stephen H. Olin* and *Lyman & Jackson*, for Cedar Falls & Minnesota R. Co.

*Benjamin F. Ayer*, for Illinois Central R. Co.

*John N. Jewell*, for Dubuque & Sioux City R. Co.

Mr. Justice HARLAN, after stating the facts in the foregoing language, delivered the opinion of the court.

With this general outline of the case, as disclosed by a very voluminous record, the court will proceed to consider the issues arising in the original suit.

We have seen that by the contract of September 13, 1867, between the Dubuque Company and the Illinois Central Railroad Company, the latter agreed to assume the lease made by the Cedar Falls & Minnesota Railroad Company to the Dubuque Company. If this assumption made the Illinois Central Railroad Company liable, as between it and the Dubuque Company, for the stipulated rental of the Cedar Falls road, during the whole period of 40 years for which it was leased to the Dubuque Company, and if the latter company, after, or when, taking back that road into its own possession, could not, to the prejudice of the Cedar Falls Company or its mortgage bondholders, discharge the Illinois Central Railroad Company from such liability, then the right of the trustee in the mortgage of September 22, 1866, to invoke the jurisdiction of a court of equity, in respect to any amount due from the Illinois Central Railroad Company, cannot well be doubted. That mortgage refers to the lease by the Dubuque Company, and covers not only the net earnings of the Cedar Falls road, constructed and to be constructed, but the rents and moneys payable by any person or company to the Cedar Falls Company for the use of said road and appurtenances. The agreement of the Illinois Central Railroad Company to assume the lease of the Cedar Falls road created no direct obligation on its part to the Cedar Falls Company, or to the trustee in the mortgage of September 22, 1866, that could be enforced by an action at law. Only by a suit in equity, to which the Cedar Falls Company in some form was a party, could the trustee obtain the benefit of the assumption by the Illinois Central Railroad Company of the lease of the Cedar Falls road to the Dubuque Company. *National Bank* v. *Grand Lodge*, 98 U. S. 123; *Keller* v. *Ashford*, 133 U. S. 610, 620, 622, 10 Sup. Ct. Rep. 494. This point is referred to and determined, because the objection to the original suit as not being one of equitable cognizance, if sound, would be sufficient to dispose of the case as to the Illinois Central Railroad Company without reference to any other question.

It therefore becomes necessary to inquire as to the scope and effect of the agreement of the Illinois Central Railroad Company to assume the lease of the Cedar Falls road. As neither the Cedar Falls Company nor

the trustees in the mortgage were parties to that agreement their understanding of its provisions, after or when its contents became known to them, cannot be of consequence. The inquiry must be restricted to the intention of the two corporations that executed it. Now, when the Illinois Central Railroad Company agreed to assume the lease of the Cedar Falls road, was it intended that it should become bound for the rent of the Cedar Falls road, after it had surrendered the possession of the Dubuque road, which constituted the link between the Illinois Central railroad and the Cedar Falls road? Of what use would the Cedar Falls road have been to the Illinois Central Railroad Company, after the surrender of the Dubuque road? It is so clear from the whole structure of the lease of September 13, 1867, that no such intention existed upon the part either of the Illinois Central Railroad Company or of the Dubuque Company that an analysis of its several provisions is unnecessary. Nor is there any ground to believe that the Cedar Falls Company or the trustees in its mortgage supposed that they could look to the Illinois Central Railroad Company for rents accruing subsequently to the surrender (whenever that might occur) of the Cedar Falls road to the Dubuque Company. If the Illinois Central Railroad Company had exercised its option to take the Dubuque road in perpetuity, the Cedar Falls Company and the trustees in its mortgage might, perhaps, have held the former liable for the rents of the Cedar Falls road during the whole term of 40 years for which it was leased to the Dubuque Company. But that option was not exercised. The reasonable interpretation of the instrument of September 13, 1867, taking into view its words and the circumstances attending its execution, is that the Illinois Central Railroad Company, so long, and only so long, as it retained the Dubuque road as lessee, would meet the obligations imposed upon the Dubuque Company in respect to the lease of the Cedar Falls road. And this construction is in no wise affected by the indorsement over the signature of the president of the Cedar Falls Company on the bonds secured by the mortgage of 1866. In respect to that indorsement, it may be said that it does not impose any obligation upon the Illinois Central Railroad Company, even by way of estoppel. There was no act upon the part of that company, in respect to the bonds or that indorsement, from which an estoppel could arise. The indorsement was not made at the instance or by the direction of the Illinois Central Railroad Company. So far as the record shows, it was entirely the work of those interested in the negotiation of the bonds secured by the mortgage of September 22, 1866. The facts set out in the indorsement are true. But if the parties making it, or causing it to be made, omitted to state the additional fact that the very instrument containing the assumption of the lease of the Cedar Falls road expressly provided for the termination of the lease of the Dubuque road at the end of 20 years, at the pleasure of the Illinois Central Railroad Company, the responsibility for such omission is upon them, and not upon the latter company.

The result is that, as the rentals due the Cedar Falls Company up to October 1, 1887, on which day its road was surrendered to the Dubuque

Company, were fully paid by the Illinois Central Railroad Company before the commencement of this suit, there is no ground whatever for a decree against that corporation. As to it, the original suit must be dismissed, with costs against the plaintiff.

In respect to the jurisdiction of the court to proceed in the cross-suit after the dismissal of the original suit as to the Illinois Central Railroad Company, we are of opinion that a final decree may be passed determining the validity of the lease of 1866 as between the Dubuque and Cedar Falls Companies, and the right of the trustee in the mortgage of 1866 to the funds in court. The original suit is based upon that lease as a valid instrument for all the purposes embraced by it, and a part of the relief sought is a decree establishing the validity of the lease, and subrogating the trustee to all the rights of the Cedar Falls Company under it, with sole authority, in view as well of the default of that company and its embarrassed financial condition, as of its alleged failure to collect and properly apply the rents and profits accruing from the mortgaged property, to receive, sue for, and have possession of such rents and profits for the purposes expressed in the mortgage. Now the relief sought by the cross-bill is directly connected with the subject-matter of the original suit, and is of an affirmative character. The cross-suit strikes at the foundation of the trustee's claim to the funds in court, namely, the lease of 1866, and asks a decree to protect the Dubuque Company from any suit upon it, either by the trustee or by the Cedar Falls Company. We perceive no difficulty arising out of the established rules of equity in the way of a comprehensive decree in the cross-suit that will determine finally, as between the Dubuque Company and the Cedar Falls Company, the efficacy of the lease of 1866, and therefore the right of the trustee, Jesup, to have and collect the rents arising from that instrument. *Kingsbury* v. *Buckner*, 134 U. S. 650, 676, 677, 10 Sup. Ct. Rep. 638; *Hurd* v. *Case*, 32 Ill. 45, 49; *Jones* v. *Smith*, 14 Ill. 229–232; *Lloyd* v. *Kirkwood*, 112 Ill. 329, 336. In Story's Eq. Pl. § 399, note, it is said:

"A distinction should be drawn between a cross-bill which seeks affirmative relief as to other matters than those brought in suit by the bill, yet properly connected therewith, and a cross-bill which is filed simply as a means of defense, since there are rules applicable to one class which do not apply to the other. Thus a dismissal of the original bill carries the cross-bill with it, when the latter seeks relief by way of defense; but it is otherwise, and relief may still be given upon the cross-bill, where affirmative relief is sought thereby as to collateral matters properly presented in connection with the matters adjudged in the bill."

So, in *Chamley* v. *Dunsany*, 2 Schoales & L. 718, Lord ELDON said:

"The defendant chargeable has a right to insist that he shall not be liable to be made a defendant in another suit for the same matter that may then be decided between him and his co-defendant, and the co-defendant may insist that he shall not be obliged to institute another suit for a matter that may then be adjudged between the defendants; and, if a court of equity refused so to decree, it would be a good cause of appeal by either defendant."

See, also, *Ladner* v. *Ogden*, 31 Miss. 344; *Worrell* v. *Wade*, 17 Iowa, 96; *Ragland* v. *Broadnax*, 29 Grat. 401.

Nor is the right to make a final decree in the cross-suit affected by the circumstance that the Dubuque Company and the Cedar Falls Company are both Iowa corporations. As said in *Schenck* v. *Peay*, 1 Woolw. 175:

"A cross-bill will be sustained in a federal court, where a defendant is compelled to avail himself of that mode of defense in order to protect himself from an injustice resulting to him from the position in which the cause stands, although the parties, plaintiff and defendant, or some of them, are citizens of the same state, provided the defendants in such bill are already before the court, and are, as parties to the original bill, subject to its jurisdiction."

*Jones* v. *Andrews*, 10 Wall. 333; *Krippendorf* v. *Hyde*, 110 U. S. 276, 4 Sup. Ct. Rep. 27; *Covell* v. *Heyman*, 111 U. S. 176, 179, 4 Sup. Ct. Rep. 355; *Pacific Railroad Co.* v. *Missouri Pac. R. Co.*, 111 U. S. 505, 522, 4 Sup. Ct. Rep. 583; *Gumbel* v. *Pitkin*, 124 U. S. 131, 144, 8 Sup. Ct. Rep. 379; *Johnson* v. *Christian*, 125 U. S. 642, 646, 8 Sup. Ct. Rep. 989, 1135.

Is, then, the Dubuque Company entitled to a decree requiring the surrender and cancellation of the lease of 1866? To what extent the Cedar Falls road, when completed, would bring business to the Dubuque road, and what was the probability of the construction of roads in Minnesota that would connect that road over the Cedar Falls road with the cities of St. Paul and Minneapolis, were matters in respect to which all parties connected with the lease of 1866 had equal opportunity for information. Indeed, they were matters about which neither party could well mislead the other. Standing in the light of the actual results of the lease, as now depicted, it is easy to see that those representing the Dubuque Company in making that lease would have done well, if, out of abundant caution, they had made its continuance dependent upon the construction, within a reasonable or fixed time, of a road or roads directly connecting Mona with St. Paul or Minneapolis. But such error of judgment, if it can be so called, upon the part of the directors of the Dubuque Company, does not justify the cancellation of the lease. The evidence of their failure in that particular mode to guard its interests, if at all pertinent to the present inquiry, can only be so in its remote bearing upon other propositions embodying the principal grounds upon which the cancellation of the lease is sought. Those propositions are that the individuals chiefly instrumental in fastening the lease of 1866 upon the Dubuque Company for the term of 40 years were prevented from exercising a sound or impartial judgment in its behalf, by reason of their personal interest in, and their relations with, the Cedar Falls Company; that they occupied at the time such relations of trust to the Dubuque Company as forbade them from representing it in a matter in which their private interests would be promoted in proportion as the terms imposed were hard on that corporation and beneficial to the Cedar Falls Company; that the contract in question, nominally one of lease, was yet one that cannot properly be enforced at law or in equity, being in its inception fraudulent and against public policy, and therefore one against which the affirmative relief asked should be given, all parties in interest being before the court.

This proposition, so far as it imputes actual fraud in the matter of the lease, is not sustained by the record. We are of opinion, upon a careful review of all the evidence, that those who participated in the making of the lease, whether on the one side or the other, believed in good faith that the completion of the Cedar Falls road to the Minnesota state line, and the leasing of it by the Dubuque Company for a term of years, at a reasonable rental, was important to, if not imperatively required by, the interests of both companies, each of which was at that time in such financial condition as to excite uneasiness in the minds of parties interested in their prosperity. We cannot perceive that there was any purpose upon the part of those to whom fraud is now imputed either to wreck the Dubuque Company, or to impose unnecessary burdens upon it for the purpose of giving increased value to the bonds and stock of the Cedar Falls Company. No one at that time doubted that the Cedar Falls road, if completed, would be a valuable feeder of the Dubuque road. And there was a hope, which unfortunately for all concerned was not realized, that the Cedar Falls road would shortly or ultimately form a link in a continuous line of road or roads connecting the Dubuque road directly with the cities of St. Paul and Minneapolis. The only matter that was the subject of serious discussion was as to the amount of rent to be exacted from the Dubuque Company for the use of the Cedar Falls road. And that question was not determined in a corner, or without full opportunity to consider it. In the face of the report made by Mason and Blackstone, disinterested and competent experts, as to what would be a reasonable rental to be paid by the Dubuque Company, upon the basis of a completed road in good condition, the presumption of fraud should not be indulged, simply because it may now appear, as the result of circumstances not foreseen, or not deemed at the time of sufficient importance to be guarded against, that the rent stipulated in the lease is larger than the business over the Cedar Falls road really justified.

Much stress, in this connection, is laid upon the evidence tending to prove that the amount of bonds and stocks allowed by the Cedar Falls Company to those constructing its road was largely in excess of the actual cost of construction. Whether such be the fact or not, we need not stop to inquire. That is a matter between the Cedar Falls Company and those receiving its bonds and stock in payment for construction. It does not, in any wise, concern the Dubuque Company, nor elucidate the real issues in the present case. If it were true that, under all the circumstances as they existed in 1866, including the depreciated value of the bonds and stocks of the Cedar Falls Company, the amount allowed by it for construction was too large, that fact would not show that the Dubuque Company is entitled to a decree canceling the lease which it made of the Cedar Falls road. The question before the Dubuque Company in 1866 was whether, in justice to its stockholders, it could afford to pay the proposed rent for the use of the Cedar Falls road. The decision of that question did not depend upon the amount the Cedar Falls Company might pay, in stocks and bonds, for the construction of its road, but it did depend upon the amount of business that would probably be done

on the Cedar Falls road after it passed, under the lease, to the control of the Dubuque Company, and after its completion to Mona. There was no concealment or misrepresentation as to the business done over the 14 miles of road constructed before the lease was made. And as to the business that would be done on the entire line when completed to Mona, and as to the probability of ultimate connection over other roads with St. Paul or Minneapolis, these were matters about which differences of opinion would exist, and were to be determined in the light of what is called "railroad experience."

Looking at all the facts and circumstances, we are of opinion that the directors of the Dubuque Company, including those who,. at the time, were holders of the bonds and stocks of the Cedar Falls Company, and expected to become interested in constructing the Cedar Falls road to Mona, were not guilty of actual fraud in leasing the Cedar Falls road upon the terms prescribed in the instrument of September 27, 1866. The lease seems to have been made in the exercise of an honest judgment upon their part as to what, under all the circumstances, the best interests of both companies absolutely demanded. The excess, if any, of the rents agreed to be paid by the Dubuque Company, over what the business of the Cedar Falls road justified, is not such as to raise a presumption of fraud upon the part of those causing the lease to be made. At most, it would only show error of judgment in respect to a matter of business.

Recurring to the main proposition advanced by the Dubuque Company, we next inquire whether the lease of 1866 should be adjudged void upon grounds of public policy arising out of the relations of trust which Jesup and others, at the time, held to that company. Without stating in detail the proceedings of the various meetings of the board of directors of the Dubuque Company at which the subject of the lease was mentioned or discussed, it is sufficient to say that the lease was approved by nine directors. Of that number, five, Morton, Knox, Stout, Schuchardt, and Robb, had no interest whatever in the Cedar Falls Company as stockholders, bondholders, or creditors, and all of that five, unless Robb was an exception, were large holders of the stock of the Dubuque Company. Of the remaining directors, Jesup, Frost, Smith, and James, were at the time holders of outstanding bonds and stock of the Cedar Falls Company, the value of which would be increased by the completion of the road. Indeed, it is a fair inference from the testimony that the directors of the Dubuque Company who were not interested in the Cedar Falls Company looked to Jesup, James, Frost, and Smith, or some of them, to provide the means for the completion of the Cedar Falls road to the state line. It is also true that the four directors last named expected to become holders of the bonds and stock issued on account of the additional road to be constructed from Waverly to Mona. While two of that number, Jesup and James, were large holders of the stock of the Dubuque Company, their interests in the Cedar Falls Company were greater than in the other company. It is not, therefore, to be questioned that, when the lease of 1866 was made, Jesup, Frost, Smith, and James

were in a position where their private interests in connection with the Cedar Falls Company might conflict with their duty as directors of the Dubuque Company. They were on both sides of the question as to the lease of the Cedar Falls road upon the terms stipulated. As stockholders and bondholders of the Cedar Falls Company, they were interested in binding the Dubuque Company to pay the highest possible rent. As directors of the Dubuque Company, their duty was to protect it against burdens that could not be prudently or safely assumed, and to advance its interests in every proper way.

These facts being admitted or proven, the inquiry yet remains, to what extent do they affect the validity and binding force of the lease or justify a decree of cancellation? The attention of the court has been called to *Wardell v. Railroad Co.*, 103 U. S. 651, 658. That was a case of a contract authorized by railroad directors pursuant to a scheme by which they were to share with the other party large sums to be realized from the contract. The court said :

"It is among the rudiments of the law that the same person cannot act for himself, and at the same time, with respect to the same matter, as the agent of another whose interests are conflicting. * * * The law, therefore, will always condemn the transactions of a party on his own behalf, when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted., Directors of corporations, and all persons who stand in a fiduciary relation to other parties, and are clothed with power to act for them, are subject to this rule. They are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect. They cannot, as agents or trustees, enter into or authorize contracts on behalf of others for whom they are appointed to act, and then personally participate in the benefits. Hence all arrangements by directors of a railroad company, to secure an undue advantage to themselves at its expense, by the formation of a new company as an auxiliary to the original one, with an understanding that they, or some of them, shall take stock in it, and then that valuable contracts shall be given to it, in the profits of which they, as stockholders in the new company, are to share, are so many unlawful devices to enrich themselves to the detriment of the stockholders and creditors of the original company, and will be condemned whenever properly brought before the court for consideration."

The case from which the above extract is made, and others of like character, are cited as requiring a decree canceling the lease in question as void upon grounds of public policy.

We do not think that the cases referred to justify such a decree in this case. A contract, in the name of a corporation, by its board of directors, is not void, if otherwise unassailable, simply because some of the directors, constituting a minority, used their position with the effect, or even for the purpose, of advancing their personal interests to the injury of the company they assumed to represent. The lease here in question, as we have seen, was approved by the nine directors of the Dubuque Company, five of whom had no personal ends to subserve by imposing upon the company a lease that was unreasonable or harsh in its terms. On the contrary, as already stated, at least four of that five were holders of the stock of the Dubuque Company, and therefore interested to guard

it against unnecessary or improper burdens. We need not inquire as to the extent of their information touching the facts bearing upon the question of the proposed lease. It is sufficient to say that they approved it, and that their approval was not, so far as the record shows, obtained through misrepresentation or concealment by their co-directors, who, in view of their personal interest in the Cedar Falls Company, ought not to have participated in deciding the question of lease or in the making of the lease. An instructive case upon this point is *U. S. Rolling-Stock Co.* v. *Atlantic & G. W. R. Co.*, 34 Ohio, 450, 465. That was a suit upon a contract by a railroad company for rolling stock. The contract was approved by eight directors of the former company, (the whole number of directors being thirteen, but only eight acted,) two of the number acting being also directors of and interested in the rolling-stock company. The defense was that the rent was not fair, nor the contract binding, because of the interest which some of the directors had in the rolling-stock company. The court said:

"If it be granted that the confirmation of the contract by the defendant's board of directors, at the meeting of August 2, 1872, was voidable in equity at the election of the company, for want of the presence at that meeting of the board of a quorum of directors who were not directors of the plaintiff, it nevertheless appears that the board was composed of thirteen persons, a clear majority of whom were affected with no incapacity to act for the best interests of the company, and who sustained no fiduciary relation to the plaintiff whatever. This majority possessed ample power to restrain and control the action of the minority, and, if the contract was voidable at the option of the company, it had full power to express the company's election if it saw fit to avoid the contract. The fact that some of the persons composing this majority might vote with those who were members of both boards, and thereby create a majority in favor of the contract, would in no wise affect the validity of the transaction, nor relieve the board from the duty to move in the matter if they desired the company's escape from liability. We have not, upon the most diligent research, been able to find a case holding a contract made between two corporations by their respective boards of directors invalid, or voidable at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company. Nor do we think such a rule ought to be adopted. There is no just reason, where a quorum of directors sustaining no relation of trust or duty to the other corporation are present, participating in the action of the board, why such action should not be binding upon the company, in the absence of such fraud as would lead a court of equity to undo or set aside the transaction. If the mere fact that the minority of one board are members of the other gives the company an opportunity to avoid the contract without respect to its fairness, the same result would follow where such minority consisted of but one person, and notwithstanding the board might consist of twenty or more. In our judgment, where a majority of the board are not adversely interested, and have no adverse employment, the right to avoid the contract or transaction does not exist without proof of fraud or unfairness; and hence the fact that five [out of thirteen] of the defendant's board of directors were members of the plaintiff's board, whatever may have been its opinion of defendant's right to disaffirm or repudiate the contract, if exercised within a reasonable time, did not disable the defendant from subsequently affirming the contract, if satisfied with its terms, or rejecting it if not; nor did it relieve it from the duty to exercise its election to avoid or rescind within a reasonable time, if

not willing to abide by its terms. That it did not do this, nor take any steps towards its disaffirmance, but continued to act under it for nearly two years and a half, receiving the rolling stock, for the use of which it stipulated, and with which it operated the whole of its road for the whole of said period, making payment for such use in accordance with the rate fixed by the contractors, very clearly appears from the admitted facts. \* \* \* Hence the conceded facts clearly establish a ratification of the contract, and prevent the the defense from denying its validity."

In determining the weight to be given to the considerations of public policy that have been pressed with so much force, the court cannot ignore the fact that more than 20 years elapsed after the lease in question was made before any action was taken by or in behalf of the Dubuque Company to have it canceled. During that long period no warning was given by it, or by its officers or stockholders, that any question could or ever would be made as to the integrity of the lease of 1866. On the contrary, at a meeting of its stockholders held March 15, 1869, a resolution approving and ratifying the lease of September 27, 1866, was confirmed by a unanimous vote of those present in person or by proxy, 27,394 shares being represented at the meeting. These proceedings were spread at large upon the records of the Dubuque Company. Now, it is said that during the whole period of 20 years while the Cedar Falls road was controlled by the Illinois Central Railroad Company, Jesup was either president or in control of the Dubuque Company, had possession of its records and papers, and dominated its proceedings, and that it was not until he and the directors whom he controlled resigned in 1887 that the Dubuque Company was in a position, or was able, to ascertain the facts, and take such steps as would right the wrong alleged to have been done to it in 1866. What facts? It is inconceivable that the fact of the lease of the Cedar Falls road to the Dubuque Company, as well as the terms of the lease, were not known, or could not easily have been known, to every director and stockholder in the Dubuque Company. If directors or stockholders of that company were ignorant for 20 years of the terms of the lease, it was because they were guilty of the grossest negligence in not making inquiry on the subject. So far from the directors or stockholders of the Dubuque Company being kept in ignorance of the lease or its terms, the company disclosed the exact situation in its annual report of January 1, 1867. In that report it was said:

"Since the last annual report, this company has leased the Cedar Falls and Minnesota Railroad, constructed a distance of fourteen miles from the junction to Waverly, and to be constructed sixty-two miles from Waverly to the state line, for forty years from the 1st of January, 1867, at a rent of $1,500 per mile, and the further sum of 35 per cent. of all gross earnings exceeding $3,500 and not exceeding $7,000 per mile per annum, and 30 per cent. of all gross earnings exceeding the sum of $7,000 per mile per annum. This road has already been a valuable contributor in bringing business upon your road. Waverly receives and forwards more freight than any station west of Dubuque."

The proof satisfactorily shows that this report went to the stockholders of the Dubuque Company. But if there was no proof on the subject,

it would be presumed at this late day that it was known to them, or that every stockholder could know, if he tried to know, all the facts.' During all that time the Dubuque Company, its officers and stockholders, have remained silent, not only leaving the Illinois Central Railroad Company to treat the lease of September 27, 1866, as valid and binding, upon the Dubuque Company, and therefore to be assumed by the former company during its possession of the Cedar Falls road, but inducing, as may be reasonably inferred, the holders of the stock and bonds of the Cedar Falls Company to believe that the rental agreed to be paid by the Dubuque Company could be looked to as a security for the full term of 40 years.    This silence and delay upon the part of the Dubuque Company cannot be excused upon the ground suggested in its answer, namely, that so long as the Illinois Central Railroad Company agreed to pay, and paid, the rent of the Cedar Falls road, it was of "no moment" to the stockholders of the former company what was the amount of such rent. That suggestion assumes that the question of the continuance of the lease concerned only the Dubuque Company.    But it was of moment to the Cedar Falls Company, its bondholders and creditors, to say nothing of its stockholders, to know whether that lease was to be carried out according to its terms, and whether the Dubuque Company intended to dispute its binding force.    If, at the instance of the latter company, or of its stockholders, the lease had been abrogated shortly after it was executed, it may be that the Cedar Falls Company could have made with other railroad corporations arrangements quite as favorable as those set forth in that lease.    The Dubuque Company had no right, therefore, to treat it as a valid lease, to be respected by the Cedar Falls Company and by the Illinois Central Railroad Company, so long as the latter retained possession of the Dubuque road, but to be repudiated as soon as the Illinois Central Railroad Company ceased to be under an obligation to assume it.

The suggestion that the facts entitling the Dubuque Company to a decree canceling the lease could not have been discovered by it until its own road was turned back to it by the Illinois Central Railroad Company, and until after the election of new directors in 1887, has no substantial ground upon which to rest.    Here is a lease of a railroad, which was treated as valid, and acted upon by all the parties concerned for more than 20 years.    At the expiration of that long period the lessee company asks a cancellation of the lease because of certain facts which it claims to have just found out, but which its stockholders and directors either knew or could easily have ascertained at any time within the past 20 years.    It may be literally true, as alleged, that the particular individuals in control of the Dubuque Company, when the cross-suit was commenced, as well as those now holding the majority of its stock, did not acquire knowledge of all the facts connected with the making of the lease until shortly before the commencement of the present litigation. After the surrender of the Dubuque road by the Illinois Central Railroad Company, the latter company, with information as to every fact bearing upon the question of the reasonableness of the rental fixed in the lease,

of 1866, purchased, in its own name, or in the name of others, a part of the stock of the former company, and a new board of directors was elected friendly to it or in its interest.   And before the cross-bill was filed the Illinois Central Railroad Company had become the owner of nearly all the stock of the Dubuque Company, with full knowledge upon its part of every fact now relied upon for the cancellation of the lease of 1866.   In short, that company, after running the Cedar Falls road for 20 years, and thereby ascertaining, to its own satisfaction, that the business on and over it did not justify the rental the Dubuque Company agreed to pay, acquired substantially the whole of the stock of that company, and is the beneficial party in interest seeking the cancellation of the lease.   Of the right of the Illinois Central Company to purchase the stock of the Dubuque Company, no question is made.   But when the latter company alleges its ignorance, until after the new board was elected in 1887, of the facts connected with the lease of 1866, it must be taken as referring to those now in control, and to those who are now its stock-holders.   Even if such ignorance existed upon the part of some of those who became stockholders of the Dubuque Company after that corporation resumed possession of its road, that circumstance cannot shut out of view the fact that those who were in any wise interested in the Dubuque road, either as directors or stockholders, when the lease of 1866 was made and for 20 years thereafter, knew, or could easily have ascertained, all the circumstances attending the execution of that instrument, as well as the nature of its terms and conditions.

Taking all the evidence together, the court must proceed upon the ground that means of knowledge, plainly within reach of stockholders by the exercise of the slightest diligence, is in legal effect equivalent to knowledge, and that the fact of the lease, as well as its terms, were fully known to each stockholder and to every officer of the Dubuque Company for 20 years and more prior to this litigation.   *Wood* v. *Carpenter*, 101 U. S. 135, 143; *New Albany* v. *Burke*, 11 Wall. 96, 107.

The fundamental error in the argument for the Dubuque Company is in the assumption that the lease was absolutely void by reason of Jesup and other directors, who were interested in the Cedar Falls Company, having participated in the making of it.   We have already indicated that, so far as the lease depended upon the action of the board of directors, its technical validity was placed beyond question by the approval of the majority of the directors, no one of whom then or ever had, so far as the record shows, any interest in the Cedar Falls Company.   But to avoid misapprehension it is well to say that, in the judgment of the court, the lease would not have been void, even if a majority of the directors of the Dubuque Company occupied the same relations to the Cedar Falls Company that Jesup, James, Frost, and Smith did when the lease was made. It would, at most, have been simply voidable at the election of the Dubuque Company, or, in a proper case, at the suit of its stockholders, and that election must have been exercised, or the suit brought, within such time as was reasonable, taking into consideration all the facts and circumstances of the case, including the nature of the property that was the subject of

the lease. This last principle is illustrated in *Oil Co.* v. *Marbury*, 91 U. S. 587; *Gas Co.* v. *Berry*, 113 U. S. 322[1]; and *Leavenworth Co.* v. *Railway Co.*, 134 U. S. 688, 704, 10 Sup. Ct. Rep. 708 *et seq.* If, as was expected, the completion of the Cedar Falls road had been followed by the construction of roads in Minnesota connecting Mona with the cities of St. Paul and Minneapolis, it may be that the lease of 1866 would have been very profitable to the Dubuque Company; in which event the courts would not have listened readily to an application by the Cedar Falls Company, after an unreasonable delay upon its part, to set aside the lease upon the ground that some of those representing it were at the time directors or stockholders of the Dubuque Company. So, if the lease had been in fact beneficial to the Dubuque Company, and if, for that reason, a majority of its directors and stockholders had desired to hold onto it, the court would not necessarily, at the instance of a minority of directors and a minority of stockholders, have set it aside simply because some of its directors were at the time personally interested in promoting the welfare of the Cedar Falls Company; though the fact that such directors, constituting a minority of those acting, participated in making the contract, would cause the whole transaction to be closely scrutinized to the end that the rights of complaining stockholders, however small in number, might not be sacrificed by those who were bound to protect their interests. This shows that the lease was not void because of the relations of some of the directors of the Dubuque Company to the Cedar Falls Company, and that it would not have been absolutely void if the majority of such directors approving the lease held such relations to the lessor company.

The rule is a wholesome one that requires the court, in cases of merely voidable contracts, to withhold relief from those who, with knowledge of the facts, or with full opportunity to ascertain the facts, unreasonably postpone application for relief. A contract not wholly invalid when executed, nor prohibited by law as relating to some illegal transaction, and which is therefore voidable only, may become, by the acts of the parties or by long acquiescence, binding upon them, especially where the nature of the property which is the subject of the contract is such that its value may be affected by its relations to other property of like kind, and by the changing business of the country. If, after the making of the lease of 1866, the directors and stockholders of the Dubuque Company had held a meeting, and, with knowledge of the facts, or with the means of ascertaining them, had declared, in words, that they would postpone application to have the lease set aside until they found out by operating the Cedar Falls road whether it was remunerative or not to them, or until the Illinois Central Railroad Company ceased to be under obligation to pay the stipulated rent, the case would not have been in point of law materially different from what it appears to be from the record before us. In so holding the court does not depart from the salutary principles announced in *Wardell* v. *Railroad Co.*, and approved in numerous cases.

[1] 5 Sup. Ct. Rep. 525.

On the contrary, while that case holds that the law will always condemn the transactions of a party in his own behalf when in respect to the matter concerned he is the agent of others, it also declares that the court will relieve against them "whenever their enforcement is seasonably resisted." Seasonable resistance cannot be predicated of a case of a merely voidable contract, where the party complaining has not simply been silent for 20 years, but with knowledge of the facts, or with full opportunity to ascertain them, has enjoyed the fruits of the contract, and treated it as valid.

The court is of opinion that, independently of any question as to the statute of limitations of Iowa, in which state the contract of lease was made, and was to be executed, the Dubuque Company is estopped to dispute the binding force of the lease of September 27, 1866, and, therefore, is not entitled to a decree of cancellation.

Other points than those above discussed are raised by the cross-bill, but they are not insisted upon in the printed arguments, and are not, in the judgment of the court, of sufficient importance to be noticed.

Let a decree be prepared and submitted to the court, recognizing the right of the plaintiff, Jesup, as surviving trustee in the mortgage of September 13, 1866, to receive the funds now in the registry of the court, and containing such other provisions as may be proper and not inconsistent with this opinion.

Judge BLODGETT, who participated in the hearing and decision of this case, concurs in the views expressed in this opinion.