COWELL v. McMILLIN et al. †

(Circuit Court of Appeals, Ninth Circuit.    February 28, 1910.)

No. 1,682.

1. CORPORATIONS (§ 316*)—DIRECTORS—VALIDITY OF CONTRACT WITH CORPORATION.

A director of a corporation is not precluded from making a contract with the corporation in which he is personally interested, where he has acted with that candor and fairness which equity requires in dealings between him and the corporation and the transaction is open and fair.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 316.*

Power of officers of corporations in individual capacity to deal with corporation, see note to Bensiek v. Thomas, 13 C. C. A. 466.]

2. CORPORATIONS (§ 189*)—STOCKHOLDERS—SUITS AGAINST CORPORATION.

An individual stockholder cannot enjoin the execution of a contract made by the corporation intra vires unless fraud is shown.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–711; Dec. Dig. § 189.*]

3. CORPORATIONS (§ 316*)—OFFICERS—CONTRACTS WITH CORPORATION—VALIDITY.

Defendant, who was president, general manager, and a director of a lime company in Washington, contracted individually for the exclusive license for the state to use a patent barrel-making machine. The company afterward by the unanimous vote of the other directors, defendant not voting, leased to him its barrel-making plant, and contracted with him to furnish all the barrels required in its business at a stated price. Defendant installed one of the machines in the plant, and, under successive renewals of the lease and contract, furnished such barrels for a number of years at a profit. Defendant did not, at the time of the contract, own a controlling interest in the company nor control the other directors, each of whom owned a considerable amount of stock. The patent machine was first offered to the company, was discussed by the directors, and its acquirement was strongly urged by defendant, but its successful operation with the timber used was questionable, and the other directors refused to risk the money for the experiment, and acquiesced in its acquisition by defendant. At the time of the contract they had as full knowledge of it as defendant, but did not share his confidence in its successful operation. The contract price of the barrels was less than the average cost had previously been to the company. *Held* that, under such facts, the contract and lease were not fraudulent nor illegal, but fair and valid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 316.*]

4. CORPORATIONS (§ 308*)—OFFICERS—INCREASE OF COMPENSATION.

The fact alone that a majority of the directors of a corporation who voted to increase the president's salary materially had previously contracted to sell him their stock on credit does not render their action illegal where they were men of business standing, and in the absence of any evidence that they acted corruptly, or that the salary voted was excessive in view of the magnitude of the corporation's business.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334–1349; Dec. Dig. § 308.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied May 9, 1910.

5. CORPORATIONS (§ 189*)—OFFICERS—SUIT AGAINST, BY MINORITY STOCK-HOLDER.

Various charges of fraud and deceit by an officer of a corporation made in a suit by a minority stockholder considered, and *held* not sustained by the evidence.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 189.*]

6. CORPORATIONS (§ 317*)—DIRECTORS—GENERAL POWERS.

The fact that the president of a corporation as the holder of a majority of the stock controlled the election of directors, and that some of the directors owned but a single share of stock, does not lessen their powers as directors, nor impeach the integrity of their acts.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 317.*]

Appeal from the Circuit Court of the United States for the Northern Division of the Western District of Washington.

In Equity. Suit by Ernest V. Cowell against John S. McMillin and the Tacoma & Roche Harbor Lime Company. Decree for defendants, and complainant appeals. Affirmed.

Ernest V. Cowell, a citizen of California, sued John S. McMillin and the Tacoma & Roche Harbor Lime Company, a corporation doing a large business making and selling lime at Roche Harbor, on the island of San Juan, Wash. The corporation has a capital stock of 1,000 shares of the par value of $100 each.

The bill alleges, in substance, that Henry Cowell owned 275 shares of the capital stock when he died on August 4, 1903, and that Ernest V. Cowell, his son, the complainant herein, owns 34 shares; that Helen E. Cowell is executrix of the will of said Henry Cowell deceased; that after the corporation was organized the defendant McMillin owned 180 shares of stock, and that the remaining shares of stock were issued to some seven persons whose names are given in the bill; that McMillin was president and manager of the company after its organization, and lived at Roche Harbor; that McMillin's salary was fixed by the first board of trustees at $2,500 per annum, but on January 29, 1889, it was raised to $3,000, and that on January 26, 1891, the board of directors, through the procurement of McMillin, increased his salary to $500 per month; that during the years 1888, 1889, 1890, 1891, and 1892, the company did a very large business and increased its assets, and out of the earnings for said five years paid cash dividends to the amount of 35 per cent. of its capital stock. It is alleged that in the course of its business, the company had erected a mill to manufacture barrels for use in marketing its lime, and built warehouses adjacent to the mill, and that it cost the corporation about 31 cents for each barrel; that during the year 1892 the Waterman-Chapman Barrel Machine Company, of Michigan, sent a representative to the corporation's place of business, and made a proposition to the corporation to install a patent machine for the manufacture of barrel staves in place of the machine then used by the corporation, said barrel machine company to receive compensation for the use of their machine by way of a royalty of 1½ cents upon each barrel manufactured; that McMillin agreed that one of the patent machines could be installed for trial, and in 1892 such patent machine was put in place and used; that McMillin, while manager, ascertained that barrels could be made by the use of the machine at a total cost, including the payment of the royalty, of 21 cents per barrel, and that in January, 1893, after having experimented with the patent machine, he made a proposition to the trustees of the company to lease the stave mill and buildings and machinery connected therewith in the manufacture of barrels from the corporation at $200 per month rental, and to sell barrels to the company at the rate of 30 cents per barrel, and that he fraudulently concealed from the trustees the fact that by using the patent machine barrels could be made at a cost of 21 cents each, and that he falsely represented the facts to the board of trustees in regard to the use of the mill machinery and the cost and expense of making the barrels, and fraudulently represented to the board of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trustees the character and value of the patent machine, and that in violation of his duties and trust, he entered into a contract with the barrel machine company in his own name for the use of the machine and the sale of the patent invention within the state of Washington; that McMillin was the only trustee who knew anything about the manufacture and sale of lime or barrels; that the trustees other than McMillin had then entered into an agreement with McMillin by which McMillin was to purchase their shares of stock at stated prices, and that thereupon McMillin fraudulently, through the representations referred to, induced the board of trustees to accept the proposition and to execute a lease in the name of the company to him for the stave mill and machinery used in the operation of the mill for five years from March, 1893, and that McMillin caused the corporation to agree with him to buy barrels at the rate of 30 cents per barrel under an agreement which provided that it might be terminated by McMillin at his option at the end of one year. It is alleged that the value of the property included in the lease was more than $40,000, and that by the terms of the lease, the company was obliged to pay all taxes and insurance and repairs, the cost of which have amounted approximately to the total sum of the rent reserved to the defendant in and by the terms of the lease. It is averred that by the terms of the agreement for the sale of the barrels by McMillin to the company, the company became bound to purchase all barrels required in its lime business upon substantially the following terms: First, the company was to bear all expense of inspecting, measuring, and delivering all material or supplies for the mill to be used in the manufacture therein in the booms or on the wharf, at the mill, and also for the delivery of all cooperage stock; second, to furnish McMillin the free use of the shops and tools and necessary storage for barrels and materials and free wharfage on all supplies; third, to receive from McMillin all staves and heads when manufactured, and to credit him therefor at the rate of 14 cents per set for staves, and 4 cents per pair for heads, payment to be made on the first day of each and every month during the continuance of the lease, and any extension thereof, and to pay the further sum of 12 cents for each barrel when the barrel is complete ready for shipment.

Complainant next alleges that, after making said contract and lease, McMillin, in fraud of the rights of the company, conducted the barrel business in his own name and on his own behalf, and sold barrels to the company, and collected therefor at the rate of 30 cents per barrel until September, 1893, when the mill was destroyed by fire; that thereupon McMillin caused the company to rebuild the mill at an expense of over $40,000, and caused another barrel manufacturing machine to be installed and that after June, 1894, when the new plant was complete, McMillin continued to operate the mill and to sell the barrels to the company at the rate of 30 cents per barrel, although he manufactured them at a cost of not to exceed 21 cents per barrel; that this continued until January 1, 1905, and that McMillin made profits of more than $20,000 per annum by making the barrels up to that time, and that he fraudulently diverted said profits from the company to himself. It is alleged that in 1893 McMillin made an agreement with all the stockholders of the company except Cowell, deceased, and this complainant, to buy all the remaining shares of the capital stock of the company not then owned by him, and that he agreed to pay in installments the purchase price of the said stock and that the stock was thereafter turned over to McMillin, and that he has since then owned and controlled all the shares of the capital stock of the company except the 309 shares owned by complainant and Henry Cowell, and his executrix, and that since the purchase of the stock, McMillin has caused the same to be voted for such persons as he selected, and has refused to elect Henry Cowell as a trustee, but has chosen "dummy" trustees who, since January, 1893, have obeyed his directions so that really he has had and has control of the corporation; that at a meeting of the trustees in March, 1895, for the purpose of defrauding complainants and other minority stockholders, and for the purpose of enabling McMillin to pay for the stock which he had bought from the other trustees out of the assets and earnings of the company, McMillin caused the trustees to pass a resolution fixing his salary at $12,000 per annum, to take effect from January, 1895, and that since said date he has collected said salary although his services have not been worth more than

$3,000 per annum, inasmuch as he has held other positions which required his time, and although he has lived in the city of Seattle and not at the place of business of the defendant company. It is further alleged that in furtherance of his fraudulent plans in January, 1895, McMillin organized a corporation under the name of the "Staveless Barrel Company," with a capital stock of $250,000, consisting of 2,500 shares of the value of $100 each; that this last-named corporation was organized by McMillin and two others, McMillin subscribing for all of the shares except two; that McMillin prepared the articles of incorporation, and charged the company $200 for the service, which sum was used in payment for the two shares of stock subscribed by the two other stockholders, and that, for the purpose of making a pretended payment for the shares of stock in the corporation subscribed for by him, McMillin made his note to the company in the sum of $249,800, and that thereafter in order to escape liability as a stockholder and to make a pretended payment of the capital stock, McMillin made a pretended proposition to the corporation to sell to it his lease of the stave mill and other property of this defendant company, and of his contract for the sale of barrels to the defendant company, and of all pretended rights which he had fraudulently acquired from the barrel machine company for the use of the patent machine for the sum of $249,800, and that he agreed to accept in payment therefor the delivery to him of his promissory note, and that he thereupon caused the trustees of the Staveless Barrel Company to accept the proposition and to deliver the note to him and to issue to him the capital stock, and that thereupon he assigned the lease and agreements to the Staveless Barrel Company, and then procured the "dummy" trustees of this defendant corporation to ratify the assignments and transfers and to substitute the Staveless Barrel Company for McMillin in the agreements; that prior to the expiration of the contract and lease in 1897 McMillin caused the "dummy" trustees of the defendant company to execute a renewal of the contract in the name of the Staveless Barrel Company for the further period of five years upon the same terms and conditions; that at the expiration of the second period of five years, about January 26, 1903, McMillin again caused his "dummy" trustees of the defendant company to renew the contract and lease for five years more, and that since January, 1895, McMillin has carried on the barrel factory in the name of the "Staveless Barrel Company"; that since January, 1895, McMillin has directed the business of the manufacturing of barrels for the use of the defendant company, and has conducted the stave mill and managed and kept the books; that the Staveless Barrel Company has paid no salary to McMillin; that between January 1, 1895, and January 1, 1905, the Staveless Barrel Company declared dividends out of the pretended earnings of its manufacturing business amounting in all to the sum of $125,000, and has made a profit therefrom in undeclared dividends of more than $25,000, no part of which has ever been credited to the defendant company.

It is alleged that through the fraudulent acts aforesaid McMillin has wronged the defendant company and complainant, and that it was made to appear that the defendant company suffered an actual loss from 1893 to 1898; that in 1894 McMillin, through his "dummy" trustees, caused the defendant company to authorize the issuance and sale of its negotiable bonds in the sum of $125,000, which are still outstanding in the hands of McMillin, though actually satisfied and paid, and that a portion of said bonds were fraudulently issued to McMillin upon the pretense that he was a creditor of the defendant company; that the shares of stock so fraudulently purchased and acquired by McMillin in January, 1893, and the bonds so fraudulently acquired by him, were retained for the purpose of gaining control of the defendant company and of its assets, and to injure the complainant and Henry Cowell and his estate, and that unless enjoined from so doing McMillin will cause the bonds to be transferred and delivered to third persons. It is charged that McMillin has used the property of the defendant for personal and private use and gain, and has failed to account to the defendant company therefor; that notwithstanding the value of the property of the defendant company and the value of its business, if it had been efficiently managed, no dividends have been paid since January, 1893, except $10,000 in January, 1893, and $6,000 in January, 1906. It is alleged that McMillin has denied to complainant or to the said

Henry Cowell an opportunity to examine the books and accounts of the defendant company until some time in 1903, when, under threat of counsel, he assented to an examination, and that it was from the report of the accountants that this complainant for the first time gained information of the true condition of the assets and liabilities of the company as shown by its books and records; that, until just before the beginning of this action, complainant had no knowledge or information concerning the frauds set forth; that McMillin has entered into arrangements to, sell the property, and will do so unless enjoined.

Complainant prays for a restraining order which will prevent McMillin from selling and transferring, or agreeing to sell and transfer, any of the business of the company or any of the capital stock acquired by him since January, 1893; that he be enjoined from selling or disposing of the shares of the stock of the defendant company acquired by him since January, 1893, or of any of the bonds of the defendant company now owned or held by him; that a receiver be appointed to take possession of all the property and assets of the defendant corporation, and carry on the business until the determination of the action, and that the receiver be authorized to bring actions as may be directed against the defendant McMillin or the Staveless Barrel Company, or such other actions as may be necessary, and that the receiver be authorized to pay the debts of the company and to wind up its affairs; that an account be taken between McMillin and the defendant company; that all of the stock of the defendant company pretended to have been bought by McMillin since January, 1893, be adjudged to have been acquired out of the moneys belonging to the defendant company, and that a decree be made distributing said stock ratably between the persons lawfully holding the remaining shares of the capital stock of the defendant company; that the pretended lease of the stave mill plant and real estate connected therewith be declared null and void, and that the contract for the sale of the staves to the defendant company be declared null and void; that the business and affairs of the defendant company be wound up and that its debts be paid, and that the proceeds be distributed ratably between complainant and other bona fide stockholders of the corporation according to their interests; and for general relief.

The defendants filed a joint answer. They deny the allegations of the complainant as to subscriptions for shares of stock alleged to have been made by persons other than McMillin about the time of the incorporation of the defendant company, and allege that when it was organized McMillin subscribed for 686 shares and that the entire capital stock was paid for by the purchase and transfer of all the property and assets of the Tacoma Lime Company and certain real estate and personal property belonging to the said McMillin, and one Masterson, at Roche Harbor, Wash. The defendants allege that the defendant has done a large business, and has enlarged its plant from 2 primitive mills to 13 of the most approved character, and has increased the output of the property from 100 barrels per day to 1,400 or 1,500, and that its assets have increased from a value of $100,000 to $600,000 approximately; that it has extended its markets, and has increased its business about $400,-000 or $500,000 per annum; that it is prosperous and practically out of debt; that it has retired all of its bonded indebtedness and has an exceedingly valuable trade. McMillin pleads that his salary was raised by the board of trustees without his procurement. He admits the payment of dividends for the first five years of the operation of the business, and says that it would have paid more had it not been hindered and harassed by the hostility of Henry Cowell, the father of the complainant in this suit. It is denied that the barrels were manufactured at a cost of 31 cents as alleged, and set forth that the average cost of the barrels for the five years preceding March 5, 1893, was 32½ cents per barrel. It is admitted that in 1892 the Waterman-Chapman Barrel Machine Company, of Detroit, wanted to install one of their patent machines, and it is averred that the machine had not been tested on the timbers of the state of Washington, and that it was problematical whether it would be successful or not; but it is alleged that McMillin examined the machine and believed that it was mechanically correct, and presented the proposition of the barrel machine to the trustees of the defendant corporation. It is set forth that he discussed the matter in detail with the trustees, pointed out the advantages of the machine if it should prove successful and the bene-

fit of using the new machine, telling them that it would be unwise to permit the machine to fall into the hands of competitors of the defendant corporation, and that he went into detail concerning its superiority; that the trustees considered and discussed the matter in detail and declined to accept the proposition, but suggested that the defendant McMillin should take the machine on his own account, and put it in the mill of the company at Roche Harbor, and demonstrate its value at his own expense with the understanding that the defendant company, should it prove successful, would have the first opportunity to receive the output of the mill; that thereafter, the defendant McMillin made the contract with the barrel machine company, which contract is made a part of defendant's answer; that in 1891 and 1892 one of the machines was installed and experimented with until September, 1892, when the stave mill, together with the barrel machine was destroyed by fire; that McMillin incurred heavy expense in testing the machine which did not do the work claimed for it, until about August, 1892.

The allegations of the bill to the effect that McMillin learned that barrels could be made for 21 cents each on the first machine are denied, and it is averred that nothing could be determined with accuracy concerning the experiments made with the machine although defendants admit that about January 14, 1893, McMillin made a proposition to lease the stave mill and building and machinery from the defendant corporation at $200 per month, and made a proposition to sell barrels to the corporation at the rate of 30 cents per barrel. All allegations of concealment of knowledge concerning the machine and false misrepresentations and all violation of duties of trust are denied. It is averred that after the destruction of the mill by fire, the corporation proceeded to rebuild its mill, and that while the mill was being rebuilt, McMillin proposed to the defendant to replace the barrel machine that had been destroyed by fire, and that the proposition was accepted on January 14, 1893; that the matter was discussed by the trustees, and all of the facts that were known to McMillin about the machine were fully laid before the trustees, and that the proposition was considered in detail by the board, and that with full knowledge and information upon the subject, the board, on March 15, 1893, authorized the execution of a lease of the mill plant, machinery, etc., and a contract for the sale of barrels by McMillin to the corporation, which contracts are made part of the answer. It is alleged that the contract was fair and just and advantageous to the corporation in that it procured a better barrel at a cost of 30 cents as against 32½ cents that had been paid for the barrels used before then. It is alleged that the financial condition of the corporation was not thought to be good enough to justify the cost and expense of experimentation with the machine, and that in the development of the machine defendant McMillin spent several thousand dollars. The defendants admit that McMillin and one Cartwright were the only trustees who lived at Roche Harbor, but deny that the trustees had no knowledge or experience in the manufacture of barrels, and aver that for several years the trustees were familiar with the cost of manufacturing lime and barrels by the defendant; deny that the trustees or any of them made any agreement with McMillin by which McMillin was to purchase their shares of stock at any price, or that any agreement of purchase by McMillin was made until long after the execution of the contract and lease of March 15, 1893, except a purchase from Cartwright made in 1891. All allegations concerning misrepresentation or concealment on the part of McMillin in respect to the lease and contract are denied, it being set forth that the contract and lease were made by the trustee, defendant McMillin not voting, and were made at a time when McMillin did not own in excess of 300 shares of the capital stock of the company. It is averred that on September 10, 1892, the property included in the lease was not worth any more than $35,000; and admitted that, under the terms of the lease, the defendant corporation was to pay for renewals, taxes, and insurance, but denied that repairs were to be paid for by the corporation. Defendants admit that the company was to buy all the barrels required in its business from McMillin during the continuance of the lease, and that the corporation was to bear all expense of inspection, measuring, and delivery of material and supplies in the mill to be used in the manufacture of barrels in the booms and on the wharves of the mill, and also for the delivery of all cooperage stock, but aver-

red that, under the old method of manufacturing, all expenses of inspecting, measuring, and delivery were all borne by the corporation, and that the defendant corporation was compelled to maintain its mill, wharves, docks, booms, and machinery. McMillin admits the conduct of the Staveless Barrel Company in his own name; admits collections from the defendant company at the rate of 30 cents per barrel, but denies all fraud as against the defendant corporation, and avers that the new barrel-making machine was put into operation about June 1, 1893, from which time barrels were delivered to the defendant company and collections made at the rate of 30 cents per barrel, in compliance with the contract of March 15, 1893, and says that the barrels cost him on an average of 23½ cents per barrel, exclusive of royalties; avers that he furnished no barrels to the company after the first of the year 1895, when he assigned his contract with the defendant corporation to the Staveless Barrel Company, and that thereafter the Staveless Barrel Company furnished barrels to the defendant company at the price hereinbefore named. He says that the assignment to the Staveless Barrel Company was made with the consent and approval of the trustees of the defendant company, and that the lease and contract were extended with the consent of the company; and it is denied that the Staveless Barrel Company is indebted to the defendant company as alleged in the complaint.

Defendants deny that McMillin made an agreement with all of the stockholders, except Cowell and the complainant, in 1893, or ever, to buy the remaining shares of stock of the defendant corporation, and deny that by virtue of any agreement McMillin was to pay for such stock in installments at future dates, but they say that McMillin agreed to buy the stock of certain stockholders without any understanding or agreement with any other stockholder, and set forth that whenever he bought stock, and did not pay for it, the stock was held in escrow or as collateral by the seller until payment was made; deny that McMillin has held and controlled all of the shares of the defendant corporation except 309, owned and held by complainant and Henry Cowell, since 1893; admit that McMillin refused to help elect E. V. Cowell or Henry Cowell as trustees; deny that he ever at any time elected or caused to be elected "dummy" trustees, but say that McMillin has voted his stock for stockholders who were men of character and experience in business affairs. Defendants deny that since January 1, 1893, the trustees have obeyed the direction of the defendant McMillin or that he has directed or controlled the corporate acts of the trustees, but aver that McMillin has been general manager and president, has had charge and general direction of the business subject to the board of trustees; aver that he has not attempted to urge any policy that he did not think to the best interests of the company, and that he opposed the election of the Cowells because they controlled the Henry Cowell Lime & Cement Company, which was a competitor in business of the defendant company, and that since the date of the organization of the Tacoma & Roche Harbor Lime Company, Cowell had carried on a vigorous attack upon the defendant corporation endeavoring to destroy defendant company's markets, forcing the price of lime down to the cost of production, and in many instances below the cost of production, and in every way annoying the defendant corporation, so that by reason of such acts the defendant corporation was prevented from making profits that it should have made, and that it was impossible to pay dividends largely by reason of the hostile attitude of the Cowells, and that the defendant McMillin did not consider them proper persons for trustees. It is alleged that McMillin's salary was raised to $12,000 by resolution of the trustees and without any fraudulent motive, and that such a salary was fair and reasonable; that McMillin, as president and general manager, has always rendered faithful and honest services to the corporation, and that he now exercises full control over the operations of the plant of the defendant corporation, looks after defendant's business, and devotes such time as is necessary to supervising, controlling, and conducting the business of the corporation.

The answer then alleges that the Staveless Barrel Company was organized without any fraudulent purpose in view and for the convenient handling of the business of McMillin and the other stockholders of the Staveless Barrel Company; that in 1891, 1892, and 1893 the defendant McMillin, in order to experiment with the barrel machine, obtained funds from his wife, who mort-

gaged her separate and individual estate to raise money to enable experiments to be conducted; that after the Staveless Barrel Company was organized Mc-Millin held 932 shares of the preferred stock of the Staveless Barrel Company and 1,485 shares of the common stock transferred to his wife, and that 1 share was given to J. M. Keene, and 11 shares to William Schultz; that the wife of said McMillin draws her dividends upon the stock as does Schultz; that after the assignment of the lease and barrel contract of March 15, 1893, to the Staveless Barrel Company that company performed all agreements made under the contract with the defendant company, and that in March, 1897, the lease and contract were renewed for five years with the Staveless Barrel Company, and that again there was a renewal on January 26, 1903, and that all of said contracts and leases were fair and honest. It is admitted that the Staveless Barrel Company has earned probably $130,000, and it is averred that the defendant corporation is in no wise interested in said dividends; that all the expenses in installing, buying, experimentation, building, operating, and maintaining the barrel machine and the manufacture of barrels have been borne by McMillin and the Staveless Barrel Company, and that the accounts between the barrel company and the lime company have been honestly carried on in accordance with the contract of March 15, 1893, and the extensions thereof. It is averred that the books of the defendant company have been honestly kept, and that no attempt has been made to divert any of the funds of the company. It is admitted that $125,000 of negotiable bonds were issued in 1894, but it is alleged that such issue of bonds was for the benefit of the company to fund its debts, and that all of said bonds so issued have been fully paid. It is denied that McMillin intends to place the bonds beyond the jurisdiction of the court. All improper use of the property of the defendant is denied, and it is averred that the defendant McMillin has always faithfully accounted for the proceeds of all sales of property and assets to the defendant company. It is averred that the assets of the company are of the value of $600,000, and that under the management of the defendant McMillin, the value of the assets has increased from $100,000 to $600,000, and that dividends have not been declared in order that the property might be improved, the business developed, and the trade extended. It is averred that the value of the stock has increased from $100 per share to $600, and that additional profits could have been made had it not been for the interference of the Cowell interests. It is set forth that McMillin never has denied access to the books and that the corporate books were at various times examined by Henry Cowell and the complainant, but that defendant McMillin did not believe that the books of account should be examined by said Henry Cowell or the complainant because they were competitors in business and were seeking the information for an improper purpose, and that for years it would not have been safe to have permitted the Cowells to examine the books, but that in 1903 counsel for Cowell was given permission to examine the books, and that then an expert was sent to go over them, and that everything connected with the affairs of the company was laid before the expert, and that complete information could have been obtained concerning the defendant company and the Staveless Barrel Company. It is alleged that the Cowells knew of the existence of the barrel contract since 1893, and that they should be estopped from questioning any of the transactions as to the salary or the course of dealings between the defendant corporation and McMillin and the Staveless Barrel Company. It is averred that McMillin was negotiating with capitalists for the sale of his stock in the defendant company, and that the negotiations would have been consummated had this suit not been instituted, and that it has been brought for the purpose of annoying McMillin and to prevent the consummation of the sale of his stock; that McMillin never contemplated the sale of the property and assets of the defendant company, and it is denied that he is about to sell or transfer the assets of the company or that the corporation is about to do so. It is averred that the corporation and McMillin are solvent, and able to meet all demands against them, and that all transactions between McMillin and the defendant company have been fully and completely known and understood by the trustees, and that the trustees have always controlled the business of the company.

Exhibit 1, attached to the answer, is the agreement dated March 16, 1891, between Bowering, trustee for the Waterman-Chapman Barrel Machine Com-

pany and John S. McMillin, concerning the barrel-making machine patent. In the agreement (so far as it is material to consider it in this case) the barrel machine company gives to McMillin the exclusive right to use and operate the barrel making machines within certain states. It is agreed that the barrel machine company shall deliver the machines to McMillin, McMillin agreeing to pay an amount equal to the actual cost of the machines not to exceed $1,500 each, and to pay the freight, which sums are to be repaid to McMillin out of the royalties to become due under the agreement.

Exhibit 2, made a part of the answer, is a letter from McMillin to the board of trustees of the Tacoma & Roche Harbor Lime Company dated January 14, 1893. In this letter, McMillin states that he owns the patents for the barrel machine for the Pacific coast, and that the test had demonstrated that a barrel could be made that would be better than the ordinary stave barrel which had been used by the company. He refers to the fire of September 10, 1892, and says that he intends to have a new machine set up, and he proposes to lease the mill and furnish the company with all barrels complete and free of all expense, as set forth in the letter and proposition so to lease the plant, including mill, wharves, docks, machinery, dry kilns, sheds, yards, structures, tools, and appliances belonging to the plant and the foreman's residence, for the period of one year, with the privilege of five; defendant corporation to proceed to complete the mill and equip it, placing the machine in it, McMillin to take all bolts on hand and booms as per inventory, and to operate the mill at his own expense, at a rental of $200 per month, McMillin agreeing to supply the company with all barrels it might require in its lime business, the lime company to furnish the mill power, and to bear the expense of inspecting, measuring, and delivering all material or supplies to be used in manufacturing, in the booms or on the wharf at mill, as McMillin might require, free of all charges, except for purchase price of such material; the company to deliver all cooperage stock; McMillin to have the use of cooper shops and tools, etc., and storage for barrels and barrel material, the company to pay McMillin 30 cents each for all barrels used; that when staves and heading were delivered in the warehouse at mill, the company should receive the same as fast as manufactured, and should credit McMillin at the rate of 14 cents per set for staves, and 4 cents per pair for heading, McMillin to pay branding, heading, and repairing of barrels before shipment, and when on dock ready for shipment, McMillin to receive a further credit of 12 cents. The company was to keep up good and sufficient booms, wharf, and mill plant, and to make payments monthly, free wharfage to be given McMillin for supplies going over its dock.

On March 15, 1893, the company entered into a lease and agreement with McMillin, the lease practically covering the real and personal property referred to in the letter of McMillin to the company. This lease was signed by the corporation by C. P. Masterson, vice president, and J. M. Keene, secretary, and John S. McMillin, lessee. As an exhibit to the answer there is also attached an agreement of March 15, 1903, between the lime company and McMillin. In this contract, the company agreed to buy from McMillin all barrels to be used in its lime business, and to bear the expense of inspecting, measuring, and delivering all material, substantially as had been specified in the letter proposition made by McMillin to the company. Barrels were to be furnished to the company for a total of 30 cents per barrel. This contract was signed by the defendant company by its vice president and secretary as parties of the first part and McMillin individually as party of the second part.

Upon these issues, substantially as stated, the testimony was heard before the master. Thereafter, the cause was heard by the court, and later an order was made dismissing complainant's bill. Complainants appeal.

Warren Olney and Hughes, McMicken, Dovell & Ramsey, for appellant.

Kerr & McCord, James A. Kerr, and E. S. McCord, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

177 F.—3

HUNT, District Judge (after stating the facts as above). Study of the pleadings already substantially stated, and of the testimony heard, discloses that the main point in this case relates to the license to use the patent barrel machine with which the defendant corporation made the barrels it used for the shipment of its lime product from Roche Harbor. Addressing themselves to this matter, counsel for complainants earnestly contend that, when the facts are ascertained, it will appear that McMillin, a corporate officer, was guilty of fraud; that he violated his trust by leasing and purchasing the property of the corporation, and by making a contract with the corporation for his own personal benefit, and that, as a consequence, the law will regard him as a constructive trustee liable to an accounting or such other obligations as equity may properly impose. It would extend this opinion to an unnecessary length were we to state and analyze the voluminous testimony in the record, so we will but briefly refer to such parts of the whole evidence as have impressed us as particularly helpful in arriving at a correct result.

Going back of the time of the barrel machine matter, we find these things of general interest: McMillin went to Tacoma, Wash., in 1884, and soon thereafter acquired a fourth interest in a lime plant at Roche Harbor, Wash. In addition to this one-fourth interest so purchased, he obtained an option upon the other three-fourths of the properties referred to, such option to expire July 18, 1886. The property consisted of 160 acres of land, containing lime ledges, together with lime kilns and some log buildings. In June, 1886, he went to California for the purpose of trying to induce a firm, of which complainant's father was a member, to buy an interest in the property at Roche Harbor. Mr. Cowell was very largely interested in lime manufacture, and had much to do with the control of prices of that product on the Pacific coast. But Mr. Cowell did not take any interest in the property, and McMillin thereafter enlisted several business men in Tacoma —Mr. Masterson, Mr. Manning, and Mr. Wallace—who were respectively the president, vice president, and cashier of the Pacific National Bank of Tacoma. Mr. Cowell, however, notwithstanding his refusal to join Mr. McMillin in 1886, acquired much knowledge of McMillin's interest in the properties at Roche Harbor, and without disclosure of his plans to McMillin, thereafter bought certain lime lands then under lease to McMillin at Roche Harbor, and soon began the manufacture of lime there under the name of the "San Juan Lime Company," and in time became a powerful competitor of the defendant company.

The defendant corporation was organized in 1886, and at once purchased the property rights of two other companies which had been owned or controlled by McMillin defendant and C. P. Masterson. McMillin and his associates owned 686 shares in the new company, and two years thereafter the elder Cowell bought 309 shares. Between 1886 and 1892, the new company, now defendant herein, increased its assets, enlarged its plant, and the value of its shares became much greater. It paid dividends amounting to $35,000, between 1888 and 1892, but has paid none since, although its assets have been added to in many ways and its trade has been extended.

In 1889 McMillin heard of a patent machine whereby a staveless barrel could be made. The question of barrels was an all-important one to the lime company, inasmuch as it used quantities of them, and the cost of making them had been and was the principal incident of its lime business. So McMillin corresponded with the patentee, the letters of McMillin indicating that his inquiries were as manager and in behalf of the defendant corporation of which he was not alone general manager, but executive head. About September, 1890, C. T. Bowering, agent for the patentee, came to Roche Harbor, and discussed the matter of the patent machine with McMillin and a Mr. Cartwright, then one of the trustees of the lime company. Bowering showed them his letters patent, and had a set of staves for a keg which he said had been made by the machine. Bowering was in or about Tacoma two months and discussed the merits of the patent barrel machine in a general way with several, if not all, of the trustees of the defendant company, and showed them the claimed merits of his invention, but he says that the trustees, other than McMillin, took very little interest in the patent. Bowering testified in effect that although he knew he was dealing with McMillin individually, yet he believed McMillin was representing the defendant company when he made the contract with McMillin for the rights to the patent machine.

McMillin himself says that he first saw the barrel machine operated at Detroit, in June, 1892; that Bowering claimed that the machine would be a great economy; that it would manufacture from 3,000 to 4,000 barrels per day, and that the package, when made up, would be practically air-tight, which would prevent air slacking. He says that the proposition to purchase the patent barrel right was discussed by Bowering and members of the board of directors from September, 1890, to March, 1891; that the discussions were informal, but that the matter was before the board of directors several times, and that he frequently urged the board to take up the patent, calling their attention to the salient features of the machine, and reminding the directors that the barrels in which the lime was being shipped were costing more than the lime itself, and that the proposition ought not to be passed if there was a probability of the successful development of the machine. The practical utility of the machine was unknown, however; it was an experiment in Washington. He says that he told the board that if the machine was not taken up by them, defendant's competitor Cowell might get it. But the board declined to become interested because of the financial condition of the company, and of the country at large and because of doubts of the success of the patent. McMillin says that Masterson, one of the directors, at a meeting when the patent question was under discussion, turned to him and said, "Why, McMillin, if you think it is such a good thing, why don't you take it up yourself?" to which he replied:

"For simply one reason, Mr. Masterson, and one only, * * * simply because I am president of this company, and, if this should prove to be a good thing, it ought to belong to the corporation; it ought not to belong to any individual member of it. It is an important feature of the company's business, and the institution itself ought to own or operate it. Whatever is done, it ought to be done by the company, and not by an individual."

Masterson replied to the effect that the question was settled; that the company would not take it; that it had "had its day in court," and that McMillin was at perfect liberty to take it if he wanted to, and could experiment with it at the corporation's plant. McMillin also says that it was then understood that if the machine should develop to be a thing of practical utility, the company should have the first opportunity·to obtain its product. He testifies that thereafter he negotiated with Bowering on an individual basis, and that on March 16, 1891, he entered into an individual agreement with the barrel machine company (Exhibit 1, referred to in the statement), after telling Masterson, one of the directors, just what he was doing. The contract between Bowering and McMillin was deposited in Mr. Masterson's bank, and was read over by Masterson.

In December, 1891, the first machine reached Roche Harbor, and in the spring of 1892 was installed by an employé of the manufacturers, who had come out from Michigan. McMillin also says, and he is corroborated in the matter, that this machine was not a success; that it was weak in construction; that its parts bent and broke, and that the agent himself was not satisfied. It seems clear that the machine could not supply defendant's need for barrels. In September, 1892, fire destroyed the stave mill and the machine that had been set up. McMillin, still hopeful that success would follow experiments with the machine, ordered that a new and stronger one should be built. Later, such a new one was installed at the company's plant at Roche Harbor, and in time it proved to be successful and of great value in manufacturing barrels.

We gather from the testimony of Manning, who was one of the directors at the time of the refusal to take up the patent, and who was a witness for complainant, that Bowering submitted his proposition concerning the barrel machine to the board of trustees of the company, and that he (Masterson) and Wallace frequently talked with McMillin about the machine; that it was a question in their minds whether it would make satisfactory barrels out of the timbers of the state of Washington. He says that, considering the fact that the machine was untried, that it was doubtful whether it would be successful, and, regarding also the financial conditions at about the time the patent was offered, it was concluded that it would not be well for the company to undertake its acquisition. Manning also says that·before the contract was made with McMillin, it was suggested to McMillin that he should take it up individually, as "he seemed to be the only one who was reasonably satisfied that it (the patent) might prove to be something for the benefit of the company." He also testified that the trustees were familiar with the negotiations between McMillin and Bowering, and that they consented that McMillin should install the machine before it was ordered, and that McMillin was given to understand that it would be satisfactory to the board for him to go ahead and acquire the machine individually if he cared to do so.

Mr. Wallace, who was also one of the directors of the defendant company when the patent was under consideration, says that he talked frequently with McMillin about the barrel machine while Bowering

was in the state of Washington; that the matter of its acquisition by the corporation was considered at a number of meetings of the trustees, and that after a good deal of discussion it was decided that the company would not install the machine; he says that he recalls that it was doubtful whether the machine would be a success, and he was not convinced that they were warranted in appropriating money to put into it. He says that McMillin presented the matter to the board and urged the company to take it from the beginning. "I am very clear on this," said the witness, "that time and again Mr. McMillin urged the company to take the machine and operate it itself, time and again. * * * I do not remember the terms, but I do know that he was anxious for the company to take the machine and operate it, but it was finally turned down. * * * He talked of the delicacy of his situation" about taking up the machine himself, because he was president and general manager, and he therefore urged that the company take it up with the patentee and experiment with it. Mr. Wallace also says that McMillin took up the matter on his own sole responsibility, and that the board took it for granted he was making a profit on his barrel contract or he would not have undertaken it.

Mr. Cartwright, who at different times was the bookkeeper and superintendent for the defendant company, says that McMillin was exceedingly anxious that the company should acquire the rights to the machine, although he (Cartwright) had no confidence in it, because he did not believe it would work on the fir of the state of Washington.

Mr. Keene, who was secretary of the company in 1890, testified that he distinctly recalled a meeting of the board when the barrel machine was discussed by the trustees. He says it was offered to the board and the board refused to take it over for the company, for the reason that the trustees thought they could not afford to experiment with it. He testified that McMillin thought the company should have it, and that McMillin looked upon the machine as an experiment. but one worth making. The board, however, declined to become interested.

We cannot find that McMillin concealed from the board of directors of the defendant company any knowledge that he possessed in respect to the probable success of the machine, or that he misrepresented anything. That he had much more confidence than his associate directors had in the potential success of the patent is evident, but the machine had not been operated, much less had it been proved a success in Washington, when the board refused to go ahead with the experiment. McMillin himself did not then know that it would turn out to be the success that it afterwards proved to be. A circumstance to sustain this is found in the right which was given to McMillin to cancel the contract at the end of a year. Again, the other directors of the company were largely interested, and while to a great extent, they relied on McMillin's integrity and business abilities in and about the management and policies of the company and its affairs, they acted against his advice in this instance, and did so under the belief that they were guarding the best interests of their company; and, consistent with their past conduct, their attitude in this suit is not only not one of complaint against McMillin's actions in the premises, but of

affirmance of what transpired between him and themselves, and of the good faith of the whole transaction of the barrel patent license and contract.

The record shows that when the original contracts with McMillin were entered into, McMillin owned 280 shares of stock in the defendant company, Masterson owned 150 shares, Manning 75 shares, T. B. Wallace 100 shares, Hugh Wallace 65 shares, Cartwright 20 shares, Keene 1 share, and complainant 309 shares; furthermore, the evidence is that McMillin did not vote upon the question of entering into the contract or lease, and that when the contract was made he had not contracted for the purchase of any of the holdings of other stockholders. The fact that afterwards, in 1894, he bought the stock of other directors is immaterial, unless the facts or circumstances surrounding such purchase tend in some way to show fraud on McMillin's part, or conspiracy between the associate directors and McMillin to serve McMillin at the expense of the corporation's and complainant's interests when the contract was made.

In so far as the industrial features of the contract need be referred to, it appears that for five years before the contract with McMillin was made, the company had been paying various prices for barrels. Complainant makes deductions of average cost of barrels in the years 1890, 1891, and 1892 only, and then argues that the average cost of barrels was 31½ cents. He says, too, that in this average the expense of towage, cartage, and insurance was charged into the cooperage account, and was therefore necessarily included in the cost of the barrels, while under the McMillin agreement, whereby barrels were to cost 30 cents each, the expense of towing, carting and insurance had to be borne by the company, and that because of these matters, in making a comparison between the former cost of the barrels and the cost under the McMillin contract, the expense of towage, cartage, and insurance must either be deducted from the former cost or added to the latter. To an extent, this reasoning is persuasive, but it loses its force when it is applied to the added facts that the company made barrels prior to 1890 at a cost which increased the average to about 32½ cents for the period between 1889 and 1893, and when there is also included the cost of items of heading up, nails, nailing the barrels, branding, and repairs of all breakage which amounted to several fractions of a cent, and which did not enter into the cost of manufacture, under the older methods, but which under the terms of the 1893 agreement were to be done by McMillin. There is evidence that the item of towage was to be borne by the company for the reason that it was easy for the defendant company to furnish it at an almost nominal cost, because of its having steam tugs in constant use. The company also used its teams daily, and witnesses say staves could be conveniently delivered at an actual cost of one-third of a cent per barrel. It appeared that insurance amounted to a fraction of a cent per barrel.

We shall not enter upon a detailed analysis of the evidence of the figures. Suffice it to say that after the strictest examination of the accounts, expert witnesses disagreed somewhat in their inferences, but the differing conclusions do not vary enough to justify a finding that

there was any fraud or cheating or bad faith on McMillin's part in respect to the provisions of the contract to supply the barrels. On the contrary, after carefully studying all the evidence, it appears affirmatively therefrom that the contract price of 30 cents per barrel was less than the company had been paying for its barrels when it bought or made them before 1892 and was less than barrels were selling for in the market at the time of the institution of this suit.

We may therefore generally summarize our discussion of the foregoing important features of this case by saying that it is our opinion that McMillin acquired the title to the barrel machine in good faith with the knowledge and consent of the board of directors of the corporation, and after the board knew all that McMillin knew of the merits of the machine and had expressly refused to become interested in it; that there was no concealment from the board of directors on McMillin's part; that McMillin made the lease of the property and the contract for supplying barrels in good faith, and that the contract when entered into was not unreasonable, unfair or illegal.

We would not, to the slightest extent, depart from the salutary rule that directors and other officers of a corporation, occupying a fiduciary relation towards a corporation, are not permitted to assume positions which will bring their private interests into conflict with their duties to act solely in the interests of their corporation; nor would we argue upon the wisdom as well as the morality of the doctrine that where a corporation has made a contract with one of its directors, or a contract wherein one of its directors is personally interested and the interested director has taken part in the making of the contract, the corporation may elect to avoid the agreement so made even though it is in fact free from fraud. But these principles are not those which control in the present case, for here the transaction, when viewed as a whole and in its several parts, between the director and his company, was entirely free from fraud, and the contract was unanimously authorized by a board of disinterested persons, the interested director not voting. Thus, the case is brought within the rule recognized by the Supreme Court of the United States, namely, that where the director has acted with that candor and fairness which equity imposes as the guide for dealing between him and the corporation, and the transaction is open and free from blame, the director is not forbidden from making a contract with the corporation, or from entering upon a transaction in which he is personally interested. Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328. See, also, Marshall on Corporations, § 377; Figge v. Bergenthal, 130 Wis. 594, 109 N. W. 582, 110 N. W. 798; Barr v. Pittsburgh Plate Glass Co., 57 Fed. 86, 6 C. C. A. 260. And an individual stockholder cannot enjoin the execution of a contract intra vires unless fraud is shown. "So long as the agents of a corporation act honestly within the powers conferred upon them by the charter, they cannot be controlled. The individual shareholders have no authority to dictate to the company's agents what policy they shall pursue or to impair that discretion which was conferred on them by the charter." Morawetz on Corporations, § 243; Jesup v. I. C. R. R. Co. (C. C.) 43 Fed. 483; Ranger v. Cotton Press

Co. (C. C.) 52 Fed. 609; Thompson on Corporations, § 4059; Bristol v. Scranton (C. C.) 57 Fed. 71.

In reaching the conclusions arrived at with respect to the main proposition in the case, we have not overlooked the positions assumed by complainant upon the several other points. We have considered them deliberately, one and all, and will briefly refer to a few on which the learned counsel have dwelt. We may say, too, our examination has been had under the conviction that the transactions involved should be very closely scrutinized, and that it has devolved upon McMillin to show that his conduct was honest, candid, and free from wrong.

Let us refer to the argument that McMillin did not intend to install the first barrel machine at his own expense, but schemed to throw the burden of such charge upon the corporation. The books disclose that while the experiments were being carried on, McMillin's salary was accumulating in a sum far in excess of any cost of installation, and that although the corporation's checks were drawn in the first instance to meet expenses, the expense of installation, together with interest, was afterwards charged to McMillin and paid by him. The bookkeeping system was somewhat intricate, and it is true the charge against McMillin was not finally entered until 1894; but there is nothing to warrant the belief that the action of McMillin was wrong or that the entries in the books were false or intended to mislead the company or any of its shareholders, or did mislead them. It is urged that the organization of the Staveless Barrel Company was a colorable transaction, designed and executed by McMillin to shield himself against the alleged inconsistent position he occupied as general manager of the defendant company, in attempting to carry out the contract made with the board. But the Staveless Barrel Company was not organized until December 28, 1894, nearly two years after the contract and lease had been entered into between McMillin and the defendant company. McMillin's business affairs were then becoming somewhat extended, and he, and others interested with him, had a right to avail themselves of corporate organization if it was thought best; hence it becomes immaterial to this suit whether he incorporated his barrel-making business or conducted it individually, unless such action as he did take, either by itself, or in connection with other acts or circumstances and facts, bears in some way upon the question of his antecedent conduct in the acquisition of the barrel patent rights and the making of the contract and the lease with the defendant corporation. We can find no such relation, however, and the matter must therefore be disregarded.

It is said that because McMillin's salary was raised by the directors to $12,000 per annum from January 1, 1895, such action was collusive and fraudulent, and was part of a design to enable McMillin to extract illegal gain from the defendant company with which to acquire the stock of his associates on the board. If this contention is sound, it must rest upon the premise that the collusion and fraud involved the members of the board of directors of the defendant company as well as McMillin himself. It is true that, when this salary was voted to McMillin, three of the four individual members of the board of

directors, who voted for the increase from $6,000 to $12,000, had contracted to sell all their shares, except one each to him; but they retained the stock as collateral, and reserved the power to control and vote the stock until the purchase price notes which had been given by McMillin, the purchaser, were paid. Of course, they were inter-ested in the payment of the notes due by McMillin, but such interests were not incompatible or necessarily in conflict with their interests in the success of the corporation, which presumably were sufficient to prevent them from sacrificing its welfare or from corruptly wasting its funds. We find no satisfactory evidence upon which to base a conclusion that the trustees who voted to increase McMillin's salary acted either corruptly or under false motive. They were men of business standing, holding very responsible positions in mercantile affairs, and it is not at all reasonable to believe that their action as directors was prompted by any course other than careful regard for what seemed to them to be the interests of the corporation. Rogers v. Nashville Ry. Co., 91 Fed. 229, 33 C. C. A. 517.

The point is made that McMillin was not in financial condition to buy the stock of his associate directors, which he agreed to purchase in 1894. It is beyond successful dispute that the sale by the share-holders to McMillin was in good faith. McMillin paid for the stock he purchased, partly in cash, and for the balance he gave notes. That he was in debt at the time of the purchase is indisputable, but the fact is proven that he had assets and credit other than his salary, and was enabled to make the payments for the stock in ways which were satis-factory to those who sold to him, and to do so without in any manner affecting the questions directly pertinent to this controversy. Granting that he used part of his salary from time to time to help pay his notes as they became due, that fact does not warrant a finding that the directors increased McMillin's salary in 1895 with the ulterior pur-pose in mind of giving McMillin means wherewith he could pay his stock purchase notes. In other words, under the evidence, McMillin's willingness to incur heavy debt to buy the stock does not carry with it an imputation of wrongdoing on his part, or on the part of those directors who voted to increase his salary.

Complaint is made that McMillin concealed from the minority stock-holders all facts which would tend to throw light on the Staveless Barrel Company's transactions, and upon matters of pecuniary inter-est to his fellow trustees, and upon the ownership by him of the ma-jority of the stock, and upon the question of his salary. Counsel's suggestions are partly met by the evidence which shows that in Janu-ary, 1895, complainant, by his attorney, examined the barrel contract and lease and knew just what they contained. It also appears that in 1903 complainant employed an expert to examine the books of the defendant corporation, and that five months were consumed by the expert in going over the accounts and papers. He made report to the complainant. Inasmuch as McMillin's personal account was cred-ited with the amount of his salary on the books of the corporation, it is impossible to believe that complainant did not know what salary was being paid. It is also a fair inference from Mr. E. V. Cowell's

evidence alone that in 1903 he well knew of the salary paid to Mc-Millin. As to the reasonableness of the amount of the salary there is the circumstance that business men of sound judgment and large experience in and about Tacoma and Seattle testified that the salary of $12,000 paid to McMillin after 1895 was not excessive, considering the value and extent of the corporation business (the plant had increased from a value of $100,000 in 1886 to about $750,000 when this suit was brought) and the degree of responsibility which went with its management.

McMillin is charged with deception and concealment at a stockholders' meeting in January, 1895, in withholding information from Mr. Cowell and his counsel, who there appeared. It appears, though, that at that meeting McMillin presented a full statement, copy of which is in the record, of the assets and liabilities of the company, as they existed on January 1, 1895. He and other directors say, too, that he answered many questions propounded orally by counsel and by Mr. Cowell. McMillin admits that he refused information to the Cowells at various times pertaining to questions of cost of manufacture, business of the agencies, contracts with customers and affairs relating to the defendant's creditors, because he felt that they wished to know such matters in order to use them against the company. His statement that the course he pursued was in pursuance of legal advice sought in an endeavor to prevent his company from being forced out by the Cowells is reasonable, and, whether his conduct was legally justifiable or not, it induces the opinion that it was prompted by no purpose other than protection of what he believed were the best interests of his corporation.

Suspicion is grounded on the fact that the first barrel contracts between McMillin and defendant company were renewed under the circumstances connected with the renewals. It appears that one of the renewals or extensions was dated May 7, 1897, and ran to April 1, 1903; another, the last, was dated January 26, 1903, and ran until 1908. Complainant is accurate in saying that a majority of the directors who authorized the renewals only owned 1 share each, when they voted to renew, having previously sold their holdings to McMillin, and that at the time of the renewals, the stock so previously purchased by McMillin had not been transferred on the books or reissued to McMillin. Failure on McMillin's part to have had the stock reissued to him is a circumstance against McMillin, but if his conduct and the actions of the board in authorizing the renewals were honest, as they were, and within the power of the board to take, as they were, and the contracts were not of disadvantage to the corporation, and they were not, this complainant was not wronged, and cannot complain of McMillin's failure to have had the stock transferred on the books. As to the last renewal in 1903, the board's action was ratified by the stockholders, all holders of stock having been previously notified of the stockholders' meeting. Here again, no fraud in fact or bad faith toward the corporation appearing, and the contracts themselves being of advantage to the company, these minority stockholders have not been wronged and cannot complain. It is insisted, however, that the directors were dummies when they voted for the renewals, because they

were elected by the vote of McMillin, the holder of the majority of the shares of stock. This must be considered in connection with all other evidence. In the sense that they owed their positions as members of the board to McMillin, complainant is correct; but, in the sense that they were mere creatures, willing or obligated to do McMillin's bidding, and to aid him in executing fraudulent designs, or knowingly to do any act beyond the law, or that was unfair or oppressive, or against the defendant company's interests, the contention is without merit. It is needless to do more than to state the elementary rule that the majority of the stockholders usually elect the directors, and that a corporation is represented by its directors, not by the stockholders. So, it is to the directors of a company that the management of its concerns and the power to make contracts are given. Nor does the fact that a director only owns one share in a corporation ordinarily alter the general rule by lessening the power vested in him as a director, the board of directors being expressly or impliedly authorized to do all acts which are proper to carry out the corporation's chartered purposes. Directors who administer the affairs of the corporation must always use the utmost diligence, good faith, and fairness to the minority shareholders, but this duty does not affect the principle that ownership of a majority of the capital stock of a corporation gives to the holders legal power to control the corporation, lay down its policies, make themselves, or those whom they select, its directors or agents, and fix their compensation. Jesup v. I. C. R. R. Co. (C. C.) 43 Fed. 483.

The fact that the defendant lime corporation apparently lost money between the years 1892 and 1897, and that the Staveless Barrel Company made money during that same time, would be significant if the facts or circumstances showed that the relation of one concern to the other was initiated in fraud, or, after being entered upon, became fraudulent in any way. But they do not. The lime company appears to have saved money in the item of barrels by its agreement to buy them at 30 cents; and the evidence of its losses in its lime business during the particular years mentioned shows that general business depression obtained at that time and bore heavily upon most commercial enterprises. The general results of the investment to the stockholders in the defendant lime company for the 16 years between 1888 and 1903 show a profit of $290,000 on the original investment of $100,000, and a profit each and every year except during the years of business dullness above mentioned.

Many of the cases cited by complainant's counsel in their brief upon the law are upon facts showing actual fraud. Among such are Jackson v. Ludeling, 21 Wall. 616, 22 L. Ed. 492; Wheeler v. Abilene Bank Building Co., 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892; Jones v. Missouri Edison Electric Co., 144 Fed. 765, 75 C. C. A. 631; Barker v. Montana Co., 35 Mont. 351, 89 Pac. 66; Miner v. Belle Isle Ice Co., 93 Mich. 112, 53 N. W. 218, 17 L. R. A. 412. The principles of law therein announced do not apply to the facts in the case under consideration.

The action of the Circuit Court in dismissing the bill was right, and the decree is affirmed.